**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| FARMLAND PARTNERS INC., | |
|      Plaintiff, | |
| v. | |
| FIRST SABREPOINT CAPITAL MANAGEMENT, LP, SABREPOINT CAPITAL PARTNERS, LP, SABREPOINT CAPITAL PARTICIPATION, LP, GEORGE BAXTER, DONALD MARCHIONY, KEITH DILLING, and JOHN/JANE DOES 1–10, | Civil Action No. |
|      Defendants. | |

## <u>COMPLAINT</u>

Farmland Partners Inc. brings this action against First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, Keith Dilling, and John/Jane Does 1–10 for an intentional and malicious scheme to manipulate the securities markets to secure a quick and illegal financial windfall by disseminating false and misleading statements about Farmland Partners.  These false and misleading statements, which have caused reputational and monetary harm to Farmland Partners, along with its shareholders, were made as part of a "short-and-distort" campaign to disparage Farmland Partners and profit from trades with legitimate investors as they digested the falsehoods disseminated by "Rota Fortunae" a/k/a David Quinton Mathews, Defendants' agent, co-conspirator, and/or accomplice.

## PARTIES

1.     Plaintiff Farmland Partners Inc. is a corporation organized and existing under the laws of the State of Maryland, with its headquarters, principal place of business, and only office located in Denver, Colorado.

2.     Non-party David Quinton Mathews published a false and defamatory article about Farmland Partners on the investor website Seeking Alpha (the "Article") and made related comments on Twitter.  He is a defendant in *Farmland Partners Inc. v. Rota Fortunae a/k/a David Quinton Mathews*, No. 1:18-cv-02351-RBJ (D. Colo. 2018) (the "Colorado Action"), from which other defendants in this case were dismissed for lack of personal jurisdiction.  At all times relevant, he acted on behalf of First Sabrepoint Capital Management, LP.

3.     Defendant First Sabrepoint Capital Management, LP ("First Sabrepoint") is an investment advisor/management company to its affiliated hedge fund, Sabrepoint Capital Partners, LP.  On information and belief, First Sabrepoint is an alter ego of George Baxter, Sabrepoint Capital Partners, LP, and/or Sabrepoint Capital Participation, LP such that justice and equity require disregarding this corporate form.  First Sabrepoint is a Texas limited partnership, its only partners (George Baxter and his company First Sabrepoint Capital, LLC) are citizens of Texas, and its headquarters and principal place of business are in Texas.

4.     Defendant Sabrepoint Capital Partners, LP ("the Fund") is a hedge fund with hundreds of millions of dollars in assets under management during the relevant period.  The Fund acts through First Sabrepoint and its employees, and it does not have its own separate employees or office.  George Baxter, a citizen of Texas, is the sole member of its general partner's general partner (Sabrepoint Capital Fund GP, LLC), which has its principal place of business in Texas.  Baxter is also its general partner's only limited partner, and on information

2

and belief none of its limited partners are citizens of Maryland or Colorado.  Its principal place of business is in Texas.

5.      Defendant Sabrepoint Capital Participation, LP ("the Fund's General Partner") is the general partner of the Fund.  It has custody of the Fund's assets and receives a performance allocation of the Fund's profits.  The Fund's General Partner also acts through First Sabrepoint and its employees.  George Baxter, a citizen of Texas, is the sole member of its general partner, which has its principal place of business in Texas.  Baxter is also a limited partner, along with First Sabrepoint employees Jean Fonteneau, Stephen Marshall, and Donald Marchiony, all of whom receive a share of its performance allocation directly and/or as investments in the Fund. The general partner and limited partners are all citizens of Texas, and its principal place of business is in Texas.

6.      Defendant George Baxter owns and/or manages First Sabrepoint, the Fund, and the Fund's General Partner, along with other affiliated entities.  (These other entities, First Sabrepoint Capital, LLC and Sabrepoint Capital Fund GP, LLC, appear to be intermediaries between Baxter and the named Sabrepoint entities, and they are not yet named as defendants because discovery to date has not revealed that these entities retained any illicit profits from the short-and-distort scheme.)  At all relevant times, Baxter was working within the scope of his employment for First Sabrepoint, the Fund, and the Fund's General Partner, and/or for his own self-interest.  He is a citizen and resident of Texas.

7.      Defendant Donald Marchiony works as an Analyst for First Sabrepoint and at all times relevant he acted within the scope of his employment with First Sabrepoint, and thus acted for the Fund and the Fund's General Partner as well.  He is a citizen and resident of Texas.

3

8.      Defendant Keith Dilling was another client of Mathews who profited from short sales of Farmland Partners' stock when the Article achieved its aim of driving down Farmland Partners' stock price.  He is a citizen and resident of Texas.

9.      Defendants John/Jane Does 1–10, whose true names are unknown, are individuals or entities who worked with or for Defendants in connection with the short-and-distort attack on Farmland Partners, including members, partners, affiliates, employees, consultants, clients, agents, and/or counsel of or for Defendants.

## JURISDICTION AND VENUE

10.      Subject matter jurisdiction lies in this Court under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, not including interest or costs, and the dispute is between citizens of different States.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

12.      This case is about Defendants' "short-and-distort" scheme against Farmland Partners.  Short selling is an investment technique in which an investor seeks to profit when a stock drops by borrowing a security, selling it on the open market, and then planning to buy it back later for less money if the stock price does decline.  While short selling can be a legitimate investment strategy, that is not what happened here.

13.      There is a pernicious industry of illegitimate short sellers who, through coordinated campaigns, anonymously publish intentionally false and misleading information about publicly traded companies and time the release and distribution to induce panic selling for the purpose of rapidly lowering stock prices so that the illegitimate short sellers can make a profit by closing their short positions before their fraud is revealed.  This type of

4

"short-and-distort" scheme violates numerous securities laws and permits traders engaging in deceptive practices to profit at the expense of legitimate investors and to undermine confidence in our public markets.  The scourge of short-and-distort online market manipulation schemes not only hurts investors, but also the companies they target and their employees, customers, and business partners, causing various types of monetary harm and lost business opportunities.

14.     Farmland Partners is a publicly traded real estate investment trust (REIT) that manages and seeks to acquire both high-quality farmland and land with agricultural development potential located throughout North America.  Farmland Partners takes pride in its heritage in farming, and sees the partnership with its farmer tenants as key to its long-term success. Farmland Partners works with farmers to lower their input costs and improve their farms, creating positive outcomes for all.

15.     Farmland Partners is publicly traded on the New York Stock Exchange under the symbol FPI.

16.     David Quinton Mathews provides investment advisory services through his company QKM, L.L.C., which is a registered investment advisor.  Before being dragged out of the shadows in the Colorado Action, he commented on publicly traded companies under the alias Rota Fortunae, including on Seeking Alpha and Twitter (@RFortunae).

17.     Mathews published a number of articles on Seeking Alpha from his Rota Fortunae account in 2017 and early 2018 about companies in which he and his clients had short positions. Mathews and his clients, including First Sabrepoint (an agent acting on behalf of the Fund), conspired to manufacture illegal profits by taking short positions in the target companies before his alias Rota Fortunae published articles designed to drive down the price of the companies' stock.

18.     First Sabrepoint employees shared several of the Rota Fortunae articles on Twitter, with one First Sabrepoint employee (Chief Operating Officer Jean Fonteneau) confirming that these articles hurt companies' stock prices.

19.     After publishing several articles attacking companies in which First Sabrepoint had the Fund take short positions, in February 2018, Mathews entered into an investment advisory agreement via QKM, L.L.C. with First Sabrepoint.  Under the agreement, First Sabrepoint paid Mathews a $9,500 monthly retainer fee.

20.     On February 22, 2018, Mathews purchased an insurance policy covering QKM's liability for reports he published on Seeking Alpha's website.  The policy was retroactively effective on January 29, 2018, which would cover his employment by First Sabrepoint and the short-and-distort scheme as to Farmland Partners.

21.     First Sabrepoint knew that Mathews published investment research to a broad audience.

22.     Mathews also had investment advisory agreements at relevant times with Keith Dilling and his father, Gary Mathews.  Mathews charged Dilling an advisory fee of 20% of the net profits made based on Mathews's investment advice.

23.     First Sabrepoint's employees and leadership were familiar with using Seeking Alpha as a forum to enhance profit on short positions.  Donald Marchiony published 12 articles on the website between March 2014 and August 2017.  Jean Fonteneau published five articles on the website between March 2014 and November 2015.  Many of these articles concerned "short ideas."

24.     On April 16 and 18, 2018, "Rota Fortunae" published on Seeking Alpha reports about the company K12 Inc.  Mathews worked on the reports with George Baxter and others at

6

First Sabrepoint.  First Sabrepoint had the Fund short K12 Inc.'s stock in advance of the reports being published, in anticipation of profiting when the reports hurt K12 Inc.'s share price. Mathews sent a near-final version of the article to other clients, including Gary Mathews and Keith Dilling, who likewise shorted K12 Inc.'s stock.

25.     On April 25, 2018, Donald Marchiony, an Analyst at First Sabrepoint, sent George Baxter an email with the subject line "FPI," attaching a Microsoft PowerPoint slide deck about shorting Farmland Partners' stock.

26.     Marchiony then discussed with Baxter that they would likely need Mathews's help to attack Farmland Partners.  Marchiony re-sent his slide deck to Baxter and noted that it "seems more like a Q short"—referring to Mathews—because Marchiony was "not sure it's something someone else would like."

27.     Marchiony's slide deck identified Farmland Partners' headquarters as being in Denver, Colorado, and recognized that Farmland Partners has substantial business in Colorado.

28.     On or around May 1, 2018, First Sabrepoint began having the Fund short sell Farmland Partners shares starting at approximately $7.50 per share.

29.     On May 3, 2018, Marchiony emailed an acquaintance at Cloverdale Capital Management, a Dallas-based hedge fund, to discuss his ideas about shorting Farmland Partners.

30.     On May 8, 2018, Marchiony emailed Mathews about Farmland Partners, a company Mathews had never heard of before, saying he was attaching a "new idea" that they might "collaborate on."  Marchiony noted that the Fund had invested 1% of its assets in short positions in Farmland Partners and was looking for a "catalyst" to drive the stock price down. He also attached his slide deck on Farmland Partners, which highlighted (among other things)

Farmland Partners' loan program, land valuation, and change of auditor, all of which were later discussed in the Article in false and misleading ways.

31.     At the time, First Sabrepoint already knew: Mathews published on Seeking Alpha under the name Rota Fortunae; over the prior year, Mathews had published numerous articles attacking companies in which the Fund was short; those articles ordinarily hurt the target companies' business prospects and stock prices, thereby making the Fund substantial profits; First Sabrepoint paid Mathews for his work on these companies; and only a few weeks prior, Mathews published a negative article about K12 Inc. after Baxter brought him the idea of researching the company.  Based on that knowledge, First Sabrepoint intended, knew, recklessly disregarded, and/or should have known that, by asking Mathews to research Farmland Partners and indicating that it had a substantial short position in the company, Mathews was substantially certain to publish a negative pseudonymous article under the name Rota Fortunae on Seeking Alpha about Farmland Partners—particularly in light of First Sabrepoint's subsequent interactions with Mathews in the course of his research and First Sabrepoint's provision of ideas, framing, and content for inclusion—thereby intentionally, knowingly, and/or recklessly causing Mathews to publish the Article and thus causing Farmland Partners' stock price to decline, interfering with its existing and prospective business opportunities, and deceiving consumers of financial information and analysis, among other things.

32.     Later on May 8, 2018, Marchiony emailed a senior analyst at Yost Capital Management about Farmland Partners, attaching the same slide deck.  The email followed up on the Farmland Partners short idea Marchiony had told him about the week prior.

33.     Marchiony also contacted Farmland Partners and spoke with an Investor Relations representative.

8

34.     After receiving Marchiony's message, Mathews began researching Farmland Partners on or around May 20, 2018.

35.     On May 24, 2018, Mathews made his first trades in Farmland Partners by short selling and purchasing short-dated put options, each of which provided the right to short-sell 100 shares at a certain price before their expiration date in a couple months.  He continued to increase his short position until the Article was published.

36.     Around this time, Mathews began working on a research report about Farmland Partners, a version of which he ultimately published on Seeking Alpha.

37.     The next day, Mathews had a several-hour meeting with Baxter and Marchiony where he gave a presentation about Farmland Partners entitled "Early Overview."

38.     On information and belief, Mathews brought a hard copy of his draft research report to this meeting for review by Marchiony and Baxter.

39.     Every draft of this research report referred to itself as an "article" with an "author" and a "publication date," said that the "author" and "clients" "stand to realize significant gains in the event that the price of [Farmland Partners'] stock declines," and generally tracked the format and content of the Article as it evolved and was ultimately published on Seeking Alpha.

40.     On June 1, 2018, First Sabrepoint had the Fund purchase thousands of short-dated put options in Farmland Partners' stock with a strike price of $7.50 expiring July 20, 2018.  This one trade involved more Farmland Partners put options than had been traded in total over the prior five months, and about 170 times more than the average daily trading volume at the time. This large bet would ultimately trigger First Sabrepoint's public reporting obligation for holdings

9

of put options, representing the first time it had reported this type of securities to the U.S. Securities and Exchange Commission.

41.     First Sabrepoint's massive trades in Farmland Partners put options created a powder keg of derivatives exposure through a process known as "delta hedging" that would transform a minor price decline into a sudden and sharp crash in the share price, as occurred when the Article was published.

42.     Over the month-and-a-half after their "Early Overview" meeting, Mathews and Marchiony exchanged dozens of emails about their scheme regarding Farmland Partners, many of which copied George Baxter.  Marchiony and Baxter used their First Sabrepoint email accounts throughout these exchanges.

43.     In these emails, First Sabrepoint provided information and assistance to Mathews. Marchiony sent Mathews a "[f]irst stab at [the] valuation discussion" and provided ideas about how "we frame" the discussion.  Marchiony also told Mathews that family farmers owned significant numbers of Farmland Partners' operating partnership units, which Farmland Partners often used to acquire farmland and which it could not use as effectively after the Article drove down its stock price.  Indeed, Mathews and Defendants understood that the short-and-distort scheme would harm Farmland Partners, including the company's ability to raise money to purchase farmland.  Baxter identified specific content for Mathews to include in the Article. Baxter also told Mathews that First Sabrepoint would reimburse him for his expenses.

44.     In addition, Mathews had at least 20 to 30 phone calls with First Sabrepoint employees about Farmland Partners.

45.     Mathews also had numerous informal lunch meetings with Marchiony and Baxter during the same period in which they discussed their plans for the Article.  Just days before

submitting the Article for publication, Mathews sent Marchiony an Excel workbook with tabs named "Presentation" which had numerous images consistent with those in the Article's tables.

46.     The emails and conversations between Mathews, Marchiony, and Baxter made clear that Farmland Partners would be harmed in Colorado, as indicated by numerous documents obtained from Colorado sources that were ultimately mentioned in the Article, including Colorado UCC filings; Washington County, Colorado deed and appraisal records; documents pulled from a District of Colorado bankruptcy case; Kit Carson County, Colorado deed records; and a 2017 Colorado Farm Land Values & Rents Survey.

47.     Mathews shared multiple pre-publication drafts of the Article with his father, each of which included the same language describing it as an "article" with an "author" and "publication date."  Mathews also asked his father, an attorney, to provide a "legal review," which his father did not provide.

48.     Mathews's father shorted Farmland Partners' stock before the Article was published on Seeking Alpha.

49.     On information and belief, Mathews's father knew and/or intended that his son would post his report about Farmland Partners on Seeking Alpha in order to create illicit profits on short positions taken before the Article was published.

50.     Mathews knew that Farmland Partners' loan program was "small on an absolute scale," as recognized in a June 7, 2018 draft of the Article.  In fact, the loan program represented only 1% of Farmland Partners' total revenue.  But he removed this language from the Article prior to publication.

51.     Mathews also knew that "on its face there is nothing inappropriate about the loan program," as admitted in a June 16, 2018 draft of the Article.  He subsequently removed this language from the Article prior to publication as well.

52.     On June 18, 2018, Jean Fonteneau sent an email to Marchiony, Baxter, and others at First Sabrepoint worried that the Fund was down 0.66%, listing Farmland Partners' stock (which the Fund ultimately spent over $4.5 million to short sell) under a header for stocks that stood to lose more than 10% of the investment.

53.     At that time, Farmland Partners' stock was trading around $9 per share, well above the roughly $7.50 per share at which the Fund had begun short selling.  Many of the put options ultimately purchased by Mathews, the Fund, and Keith Dilling were set to expire on July 20, 2018 if Farmland Partners' stock price did not fall by more than $1 per share by that date, which would result in a loss of the money spent on those options.  Farmland Partners did not have any earnings call or other disclosures or events scheduled before then that might explain the timing of those purchases and their expiration date.  And First Sabrepoint had no intention of losing money on Farmland Partners, which would have risked losing money for its investors.

54.     The next day, June 19, 2018, Marchiony sent Mathews a "[f]irst stab at [the] valuation discussion."

55.     On June 26, 2018, Mathews emailed his client Keith Dilling a draft of the Article, with the same language referring to itself as an "article" with an "author" and "publication date."

56.     From June 26 to July 6, 2018, Dilling purchased put options shorting Farmland Partners' stock.  On information and belief, Dilling shorted Farmland Partners because he knew and/or intended that Mathews would post his report on Farmland Partners on Seeking Alpha, based on his past experience with Mathews drafting articles for publication on Seeking Alpha,

his accumulation of short positions in Farmland Partners, and their communications leading up to the Article's publication.

57.     On or around July 2, 2018, Mathews submitted a near-final draft of the Article to Seeking Alpha for publication to the investing community under the alias Rota Fortunae.  On numerous occasions and with repeated emphasis, Mathews asked that the Article not be published until a specific date and time, making clear that the scheme involved timing the Article to increase its impact.

58.     On information and belief, Marchiony and Baxter were aware of the contents of the Article they paid Mathews to research, among other things, having hired Mathews to research; their role in spurring and developing Mathews's research; their provision of ideas, framing, content, research, and resources; their repeated communications and meetings with Mathews throughout the period in which he was drafting the Article; and their receipt of Mathews's Excel workbook containing many of the Article's tables.

59.     Also on July 2, 2018, Mathews sent Dilling the Article draft he submitted to Seeking Alpha, calling it "new research from QKM."  Dilling replied: "Will review."

60.     On July 3, 2018, a Seeking Alpha editor with whom Mathews had worked previously, John Leonard, provided feedback and identified three questions related to the Article's allegations that Mathews was required to raise with Farmland Partners prior to publication.  As explained in Seeking Alpha's policies, "It is important to get the entire story and give the company a chance to explain itself."

61.     On July 5, 2018, before having sought comment from Farmland Partners, Mathews preemptively revised the article to note that he had reached out to Farmland Partners but it "did not respond."

62.     Four days later, on July 9, 2018, Mathews informed Leonard that "We are reaching out to management today around lunch" and then would resubmit the article the next day for publication "before [the] market opens on Wednesday," July 11, 2018, repeatedly referring to the authors as "we" in these emails.

63.     On July 9, 2018, Farmland Partners received a letter by email from Texas attorney Matthew Mitzner of the law firm Mitzner PLLC, addressed to Farmland Partners' headquarters in Denver, Colorado.

64.     Mitzner's letter stated that he represented a "group of investors" who "have prepared and anticipate publishing an article about the Farmland Partners Inc. ('Farmland Partners') Loan Program."

65.     On information and belief, the phrase "group of investors" in Mitzner's letter to Farmland Partners included not just Mathews but also Defendants and others, based on First Sabrepoint's role as one of Mathews's investor clients, the Fund's short position in Farmland Partners, and their role in spurring and developing the Article.

66.     Mitzner's letter stated that "[p]rior to publishing the prepared article, by this email, we are providing your company the opportunity to respond to the main issues the article addresses, represented by our below-listed questions."

67.     Mitzner's letter listed 31 bullet points setting forth even more numerous questions spanning more than two pages.  The questions in Mitzner's letter covered a broad range of topics and sought precise details about dollar values, individuals, and timeframes.

68.     Undermining any notion that anyone involved in the short-and-distort attack was genuinely interested in answers to those questions, Mitzner's letter provided Farmland Partners

14

with only 24 hours to respond prior to publication of the "prepared article," without even attaching a copy of the "prepared article."

69.    Mitzner's letter stated that, "in light of the deadline and a variety of prior obligations that have me out of the office during this period, we will neither receive nor be responding to any phone calls concerning this matter."  Mitzner's letter included no justification or proper purpose for the unreasonable time period provided for a response, did not mention that the short positions of Mathews, the Fund, Dilling, and Gary Mathews in Farmland Partners' stock were expiring soon, and refused to discuss any of the questions posed.

70.    Farmland Partners did not provide responses to the questions in Mitzner's letter within the 24-hour deadline, in part given the limited time available to even ascertain whether doing so could have implicated regulations governing the selective disclosure of material non-public information, and also because of Mitzner's unavailability to discuss the questions during the limited time window he provided for a response.

71.    Mitzner's letter did not provide an explanation for why the questions posed were not raised through appropriate, available investor-relations channels.

72.    On July 10, 2018, Mathews told Seeking Alpha that Farmland Partners did not respond to his questions and confirmed his request for publication of the Article on July 11, 2018 at 8:30am Eastern Time, 30 minutes before the stock market opened.

73.    On July 11, 2018, the anonymous Article about Farmland Partners was published on the website Seeking Alpha, which identified the Article as an "Editors' Pick."

74.    On information and belief, First Sabrepoint, Dilling, and others who, after corresponding with Mathews, purchased short-dated put options in Farmland Partners that would

expire worthless on July 20, 2018 or shortly thereafter knew or had reason to know that he was planning on publishing the Article before those options expired.

75.     Farmland Partners did not have any earnings call or other disclosures or events scheduled during the pendency of these short-dated put options, and/or immediately preceding or following the ultimate publication date of the Article, that might explain the volume of short trading in Farmland Partners' stock by Mathews, the Fund, Dilling, and/or others in the lead up to the Article's publication.  Meanwhile, Farmland Partners' share price was rising while Mathews drafted the Article, threatening significant losses on their short positions.

76.     On information and belief, Marchiony and Baxter knew that Mathews was going to publish the Article on Seeking Alpha with related promotional Tweets, gave substantial assistance and encouragement that was a substantial factor in Mathews's publication of the false and defamatory Article, and/or directed Mathews to publish it, based on their recent work with Mathews on shorting K12 Inc. and several other companies, the fact that Mathews had published the results of that work on Seeking Alpha and repeatedly promoted the work on Twitter, and their numerous meetings, emails, and calls during the relevant period.

77.     On information and belief, First Sabrepoint knew that Mathews was in the business of publishing articles that would be read by Colorado investors, given his publication history as Rota Fortunae and Seeking Alpha's nationwide audience.

78.     The Article represented that its authors had significant knowledge about Farmland Partners' business, yet it contained numerous false and misleading statements about Farmland Partners.  In addition, the Article was purportedly based on information that was already in the public domain, not on new information.

79.     The Article falsely and misleadingly asserted that Farmland Partners "faces a significant risk of insolvency."  This statement was first drafted in substantially similar form no later than version 10 of the draft Article, on or around June 26, 2018, and thus all Defendants who reviewed the document on or after that date knew or had reason to know that the false and misleading statement would be published.  Not surprisingly, the Article did not refer to the actual definitions of insolvency or how those well-accepted concepts could apply to Farmland Partners' financial condition (they do not apply, as evidenced by Farmland Partners' continued solvency).

80.     The Article falsely and misleadingly asserted that Farmland Partners "ignores very real expenses when it promotes adjusted funds from operations (AFFO).  Excluded expenses include the dividend on FPI's preferred 'B' shares."  Days after the Article was published, a commenter pointed out the falsity of this statement, which Marchiony relayed to Mathews.  Mathews and Defendants knew it was a false statement.  Indeed, Marchiony's Farmland Partners slide deck correctly described AFFO.  Mathews then admitted the falsity in a reply in the Article's comments but did not attempt to correct the Article until, on July 19, 2018, Seeking Alpha required Mathews to do so, conceding that the previously published statement was false.

81.     The Article falsely and misleadingly asserted that Farmland Partners "is artificially increasing revenues by making loans to related-party tenants."  This statement was first drafted in substantially similar form no later than version five of the draft Article, on or around June 11, 2018, and thus all Defendants who reviewed the document on or after that date knew or had reason to know that the false and misleading statement would be published.

82.     The Article falsely and misleadingly asserted that Farmland Partners failed to properly disclose the financial impact of its loan program.

17

83.     The Article falsely and misleadingly asserted that directors and an officer of Farmland Partners have left the company, and a Farmland Partners auditor was dismissed due to disputes with the company, based on issues raised in the Article.  The Article stated that "it appears that we are not the only concerned party.  Since making its first loan to [a non-party] . . . four board members and FPI's president have resigned.  And in March, Farmland Partners dismissed PWC."

84.     The Article falsely and misleadingly asserted that Paul Pittman, Farmland Partners' Chairman and CEO, through Hough Holdings, pledge shares of Farmland Partners for a bank loan with Bank of the West.

85.     The Article falsely and misleadingly said in Rota Fortunae's disclaimer: "I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it."

86.     The Article also took aim at Paul Pittman, Farmland Partners' Chairman and CEO and a Colorado resident, personally, by repeatedly attacking his public statements regarding Farmland Partners' valuations and financial health and his business dealings with Farmland Partners.  Among other things, in the context of the Article's false and misleading assertions, the Article displayed malice by attacking Pittman's defense of Farmland Partners with respect to short sellers, evincing an intent to punish Pittman for stating that "the roughly 10% short in our stock are going to get killed, and I'll be cheering the day it happens."

87.     The Article displayed further malice by stating that Rota Fortunae "think[s] the shares [of Farmland Partners' stock] are uninvestible."

88.     On information and belief, the Article's statement that the company's stock is "uninvestible," like the Article's unsupportable statement that Farmland Partners "faces a significant risk of insolvency" (and many other statements described herein and the article as a

whole), was included in the Article specifically to drive the price of Farmland Partners' stock down so that Defendants could profit before the falsity of its statements could be revealed, in part based on how various trading algorithms, traders, and/or the public would respond to those terms—both of which appear in the Article's title.

89.     At the time of the Article's publication, there were investors with substantial short positions and/or put options in Farmland Partners' stock that were soon going to expire.

90.     Mathews and Defendants achieved their goal, because soon after publication of the Article, Farmland Partners' stock price dropped by approximately 39%.

91.     On Seeking Alpha's "About" page, Seeking Alpha stated that it had 13 million visitors, which on information and belief include numerous visitors from Colorado.

92.     The Article hurt significant shareholders in Farmland Partners, including Colorado financial companies and shareholders in Colorado who sold or held onto shares that lost value following the decline in Farmland Partners' stock price, as well as family farmers.

93.     Defendants profited from the related short positions they held when Farmland Partners' stock price dropped.  Instead of losing money, David Quinton Mathews made at least $201,245.35, Dilling made at least $197,059.70, Gary Mathews made at least $28,346.48, the Fund made millions, First Sabrepoint received a larger management fee from the Fund based on these profits, and the Fund's General Partner received a performance allocation of several hundred thousand dollars, some of which was shared with Baxter and Marchiony.

94.     On information and belief, John/Jane Does 1–10 also profited from short positions in Farmland Partners' stock.

95.     Seven minutes after the Article was published on Seeking Alpha, Mathews's Twitter handle @RFortunae Tweeted a link to the report and tagged the *Denver Post* and two *Denver Post* reporters.

96.     Defendants continued to execute on the scheme.  George Baxter and First Sabrepoint employee Stephen Marshall "liked" @RFortunae's Tweet sharing the Article, helping spread its publication.  Donald Marchiony posted Tweets about Farmland Partners and shared the Article shortly after its publication, further spreading its publication.

97.     Donald Marchiony sent a link to the Article shortly after its publication to his friend at Yost Capital and acknowledged that he worked "to develop the thesis" of the Article.

98.     In the following days, Marchiony and Baxter sent and received numerous emails about the Article that did not indicate any surprise at First Sabrepoint's "thesis" being published, and instead discussed the Article in ways that confirmed having worked with Mathews on the research that led to the Article, thereby approving and ratifying Mathews's conduct.

99.     On information and belief, First Sabrepoint and its employees intended, knew, and/or were recklessly indifferent to the fact that the statements to be published in the Article were false and defamatory, based on their frequent discussions with Mathews about the contents of his "research report," their review of a draft of the Article prior to publication, and several of the false and defamatory statements having first appeared in the draft Article at least a month before publication.

100.    On information and belief, Mathews had a meeting of the minds with First Sabrepoint, Marchiony, and Baxter to write and publish the relevant statements about Farmland Partners, and/or First Sabrepoint, Marchiony, and Baxter aided and abetted Mathews in writing and publishing those statements, based on their actual course of dealings that earned First

Sabrepoint's hedge fund millions of dollars in profits, in which (among other things) First Sabrepoint provided Mathews with the Article's idea and its key themes, suggested framing and content for inclusion in the Article, provided research and resources, supervised Mathews's performance through repeated communications and meetings, and paid Mathews a monthly salary while he worked on the Article.

101.    On information and belief, notwithstanding the terms of the agreement regarding the nature of the relationship between Mathews and First Sabrepoint, Mathews acted as First Sabrepoint's agent such that First Sabrepoint controlled and/or had the right to control his writing and publishing of the Article on Seeking Alpha and related promotional Tweets based on the aforementioned facts.

102.    Later on July 11, 2018, Farmland Partners promptly issued a press release denying several of the more spurious allegations in the Article.

103.    Also on July 11, 2018, based on statements made in the Article and repeated by Defendants and other individuals who further disseminated the same falsehoods, a class action lawsuit was filed against Farmland Partners in the United States District Court for the District of Colorado, alleging violation of federal securities laws.  That suit, which essentially regurgitates the Article, is without merit and is being vigorously defended.  In addition, a number of derivative actions have been filed against Farmland Partners based on the false and defamatory statements made in the Article.

104.    On July 11 and 12, 2018, Rota Fortunae posted more false and misleading statements on Twitter regarding Farmland Partners, using the Twitter handle @RFortunae, repeatedly characterizing the false information in the Article as "facts."

105.     On July 16, 2018, the Twitter handle @RFortunae posted further false and misleading statements on Twitter about Farmland Partners, again characterizing the false information in the Article as "facts."

106.     @RFortunae's false and misleading statements on Twitter also took aim at Pittman, Farmland Partners' Chairman and CEO, personally, by, among other things, attacking his public statements regarding Farmland Partners' loan program and responding to Farmland Partners' July 11, 2018 press release by threatening additional articles that would focus specifically on Pittman.

107.     On information and belief, Mathews and Defendants intended for the Article and related Twitter statements to be read by members of the public, including current and prospective shareholders and business partners of Farmland Partners, and including those in Colorado, and members of the public did so.

108.     Because of this short-and-distort scheme, Farmland Partners missed out on profits and growth, had employees quit, and faced increased costs.  The scheme also derailed a pivotal joint venture that had been well underway, having gone through extensive due diligence, reaching agreement in principle, and awaiting only final documentation when the Article was published.  Farmland Partners had reason to believe that once this first joint venture was finalized, other similar deals that had also gone through multiple meetings and discussions of deal terms would promptly be finalized as well.  The short-and-distort scheme thus cut off Farmland Partners' deal in hand and other significant opportunities that were expected to follow shortly thereafter.

109.     Based on information available and reviewed, including Farmland Partners investor calls and other financial information, and as investment analysts, First Sabrepoint knew

or should have known that Farmland Partners was actively exploring joint ventures and related business opportunities.  As investment analysts, First Sabrepoint also knew or should have known that derailing Farmland Partners' first joint venture would impact its ability to secure other business opportunities.

110.   On July 17, 2018, Farmland Partners issued a second statement ("July 17 Statement") providing a detailed, comprehensive, and accurate rebuttal of the false and misleading statements in the Article, consistent with its obligations as a publicly traded company.

111.   Farmland Partners' July 17 Statement responded to some specific false and misleading statements in the Article, including the following:

a)  Farmland Partners faces no material risk of insolvency;

b)  Farmland Partners did not exclude dividends on the Company's Series B Participating Preferred Stock from Adjusted Funds From Operations ("AFFO"), as the inclusion of such dividends in the AFFO calculation is clearly explained in Farmland Partners' disclosures;

c)  Farmland Partners did not make undisclosed loans to related parties;

d)  Farmland Partners did not fail to properly disclose the financial impact of the loan program;

e)  No director or officer has left Farmland Partners due to a dispute with the company;

f)  No auditor has been dismissed due to a dispute with the company; and

g)  Farmland Partners' Chairman and CEO has never pledged any of his shares.

112.    Farmland Partners notified Seeking Alpha regarding the false and misleading statements in the Article through Seeking Alpha's "dispute an article" process, but Seeking Alpha refused to withdraw the Article, based in part on the "correction" published on July 19, 2018.

113.    The July 19 "correction" was published that day without changing the original July 11, 2018, date and continued to identify the Article as a "Jul[y] 11" "Editors' Pick."

114.    The July 19 "correction" conceded that there were false statements in the Article, and changed portions of the original Article, but it did not correct all the false and misleading statements Farmland Partners specifically identified in its press release, and the "correction" was published long after the decline in Farmland Partners' stock price resulting from the original Article on July 11, 2018, after Mathews and Defendants closed out and profited from much of their short positions, and after a class action lawsuit was filed against Farmland Partners based on the Article's claims.

115.    The Article falsely stated that Farmland Partners had not contacted Seeking Alpha or Rota Fortunae.  Instead, Farmland Partners disputed the Article on Seeking Alpha, and Farmland Partners, through counsel, contacted Mitzner, who represented Rota Fortunae.

116.    Farmland Partners repeatedly requested that Seeking Alpha remove the Article, but Seeking Alpha refused, and the Article remains published on Seeking Alpha's website.

117.    On July 23, 2018, Farmland Partners filed suit in Colorado against "Rota Fortunae" and the John/Jane Doe defendants who worked with him in connection with the Article.

118.    Because of the Fund's put option position in Farmland Partners at the end of June 2018, it was one of only a few entities that was required to publicly disclose those holdings.

24

Rather than make this disclosure, First Sabrepoint requested confidential treatment from the U.S. Securities and Exchange Commission for its position, which was ultimately denied several months later.

119.    Mathews withheld his real identity and the identities of any John/Jane Doe defendants until June 8, 2020, when he was forced to disclose his name and the names of First Sabrepoint, Marchiony, Baxter, and Dilling in response to the U.S. District Court for the District of Colorado's order granting Farmland Partners' motion to compel.

120.    Long after the litigation was filed, and just after Mathews revealed his identity and those of Defendants, Marchiony deleted his Tweets about Farmland Partners from two years prior.  On information and belief, George Baxter also deleted Tweets about companies that the Fund had shorted and about which Mathews had published articles.

121.    On July 10, 2020, Farmland Partners moved for leave to file a first amended complaint with the real names of Mathews, First Sabrepoint, Marchiony, and Baxter.  The court granted Farmland Partners' motion and found that identifying these Doe defendants by name "will not prejudice those Defendants" because "they obviously know what roles they played in the underlying activity, and know or should have known that they might ultimately be brought into this case."

122.    Farmland Partners later learned that a First Sabrepoint consultant had reached out to Farmland Partners on July 23, 2018, for information on the lawsuit, and that George Baxter subscribed to notifications on the case for most of the nearly two years before Defendants' identities were revealed and they were brought into the case.

123.     At some point while the case against Mathews was pending, the Article was revised to remove Rota Fortunae's disclaimer that had said: "I wrote this article myself, and it expresses my own opinions.  I am not receiving compensation for it."

124.     On October 16, 2020, First Sabrepoint, Baxter, and Marchiony moved to dismiss the Colorado Action against them on personal jurisdiction grounds.  The U.S. District Court for the District of Colorado granted their motion to dismiss for lack of personal jurisdiction on February 26, 2021.  The Colorado Action against Mathews remains ongoing, with Farmland Partners' complaint surviving Mathews's motion to dismiss and motion for summary judgment.

125.     Based on the preceding paragraphs, Farmland Partners brings the following claims for relief under Colorado law, and in the alternative under Texas law, both of which are satisfied by the aforementioned allegations.

### FIRST CLAIM FOR RELIEF
### (Disparagement/Business Disparagement)
*First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, and John/Jane Does 1–10*

126.     Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

127.     Defendants and their agents, co-conspirators, and/or accomplices published, or intentionally, knowingly, and/or recklessly caused to be published, false and disparaging statements about Farmland Partners.

128.     Defendants and their agents, co-conspirators, and/or accomplices published or caused to be published false and disparaging statements about Farmland Partners in a manner that ensured third parties would read them.

26

129.    The false and disparaging statements published about Farmland Partners were read by members of the public, including holders of Farmland Partners' stock and current and prospective business partners of Farmland Partners.

130.    On information and belief, Defendants and their agents, co-conspirators, and/or accomplices understood and intended that the false and disparaging statements about Farmland Partners would have the effect of preventing others from doing business with Farmland Partners and interfering with and disrupting Farmland Partners' business relationships.

131.    The false and disparaging statements about Farmland Partners were and are derogatory to Farmland Partners' business, and played a substantial part in inducing others not to do business with Farmland Partners.

132.    Defendants and their agents, co-conspirators, and/or accomplices published or caused to be published false and disparaging statements about Farmland Partners, intending to obtain financial gain by causing harm to Farmland Partners' pecuniary interest.

133.    On information and belief, Defendants and their agents, co-conspirators, and/or accomplices published or caused to be published false and disparaging statements about Farmland Partners with malice, with knowledge of the statements' falsity or reckless disregard for their truth, intending to cause financial harm to Farmland Partners, by, for example, personal attacks on Paul Pittman, Farmland Partners' Chairman and CEO, among other things.

134.    Farmland Partners suffered substantial damages and specific pecuniary losses in Colorado, including drops in its stock price, lost business opportunities, and defense costs, as a direct and proximate result of Defendants' and their agents', co-conspirators', and/or accomplices' publishing or causing to be published false and disparaging statements about Farmland Partners.

27

**SECOND CLAIM FOR RELIEF**
**(Intentional and Tortious Interference with Prospective Business Relations/Advantage)**
*First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, and John/Jane Does 1–10*

135.    Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

136.    Farmland Partners is a publicly traded company whose stock is purchased and owned by various shareholders, with whom Farmland Partners has business relations.

137.    The purchase and holding of Farmland Partners' stock by shareholders confers a benefit upon Farmland Partners that was expected to continue prospectively.

138.    Farmland Partners had prospective business relations and advantages with many third parties, including, but not limited to, current and potential investors, lenders, property owners, and farmers, with whom there was a reasonable probability that Farmland Partners would have entered into a business relationship, such as the cancelled joint venture that had been well underway when the Article was published and other joint ventures that were reasonably expected to follow.

139.    Defendants and their agents, co-conspirators, and/or accomplices knew or should have known about Farmland Partners' prospective business relations and advantages with many third parties, including, but not limited to, current and potential investors, lenders, property owners, and farmers, based on their review of Farmland Partners' publicly available financial documents and investor calls.

140.    Defendants and their agents, co-conspirators, and/or accomplices intentionally induced Farmland Partners shareholders to sell their shares or acted with knowledge that this was certain or substantially likely to happen by making or intentionally, knowingly, and/or recklessly causing to be made false, misleading, defamatory, and/or disparaging statements about Farmland

28

Partners, thus interfering with prospective business relations and advantages that Farmland

Partners anticipated would confer benefits upon it in the future.

141.    On information and belief, Defendants and their agents, co-conspirators, and/or

accomplices intentionally induced potential Farmland Partners shareholders and other potential

business partners to decide not to purchase Farmland Partners shares or engage in other business

activities with Farmland Partners, or they acted with knowledge that this was certain or

substantially likely to happen, by making or causing to be made false, misleading, defamatory,

and/or disparaging statements about Farmland Partners, thus interfering with prospective

business relations and advantages that Farmland Partners anticipated would confer benefits upon

it in the future.

142.    On information and belief, Defendants and their agents, co-conspirators, and/or

accomplices intentionally and improperly prevented the formation of contracts between

Farmland Partners and current and/or potential shareholders and/or other business partners.

143.    Farmland Partners suffered direct harm in Colorado from Defendants' and their

agents', co-conspirators', and/or accomplices' intentional interference with Farmland Partners'

prospective business relations and advantages, including a drop in its stock price and the loss of

business opportunities.

### THIRD CLAIM FOR RELIEF
**(Deceptive Trade Practice in Violation of the Colorado Consumer Protection Act)**
*First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, and John/Jane Does 1–10*

144.    Farmland Partners incorporates by reference the preceding paragraphs of this

Complaint.

145.    Defendants and their agents, co-conspirators, and/or accomplices engaged in a

deceptive trade practice by publishing, or intentionally, knowingly, and/or recklessly causing to

29

be published, false and misleading representations of fact that disparaged the services, property, and business of Farmland Partners.

146.    Defendants and their agents, co-conspirators, and/or accomplices work in the field of securities trading as part of their businesses, vocations, and/or occupations.

147.    Defendants and their agents, co-conspirators, and/or accomplices make or cause to be made public statements about financial markets in the course of their businesses, vocations, and/or occupations.

148.    Defendants and their agents, co-conspirators, and/or accomplices buy and sell securities in the course of their businesses, vocations, and/or occupations.

149.    Defendants and their agents, co-conspirators, and/or accomplices made or caused to be made false and misleading representations of fact about Farmland Partners in the course of their businesses, vocations, and/or occupations.

150.    The false and misleading representations of fact about Farmland Partners did and do significantly impact the public as actual or potential consumers of published information about financial markets.

151.    The false and misleading representations of fact about Farmland Partners did and do significantly impact the public as actual or potential investors in securities by harming purchasers, prospective purchasers, and shareholders of Farmland Partners' stock.

152.    The false and misleading representations of fact about Farmland Partners did and do significantly impact the public by harming consumers of Farmland Partners' services who have past, present, or future business relationships with Farmland Partners, including its current or potential tenant farmers and business partners.

153.   Farmland Partners, in the course of its business, suffered an injury in fact to its legally protected interests in Colorado, including the right not to have its stock price wrongly manipulated by unethical short sellers through disparagement and defamation.

154.   Farmland Partners' injury in the course of its business was a result of Defendants' and their agents', co-conspirators', and/or accomplices' deceptive trade practices.

### FOURTH CLAIM FOR RELIEF
**(Civil Conspiracy)**

*First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, and John/Jane Does 1–10*

155.   Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

156.   Defendants worked with Mathews and QKM, L.L.C. in connection with the false and misleading statements about Farmland Partners that were made publicly in an internet article and on Twitter.

157.   On information and belief, John/Jane Does 1–10 are individuals or entities who worked with or for Defendants in connection with the false and misleading statements about Farmland Partners that Defendants and Mathews and QKM made publicly in an internet article and on Twitter, including members, partners, affiliates, employees, consultants, clients, agents, and/or counsel of or for Defendants.

158.   Mitzner's letter to Farmland Partners stated that there is "a group of investors" behind the "prepared article," rather than an individual.

159.   Mathews's private emails and the Article repeatedly indicated that there were multiple individuals involved in creating the Article through repeated use of the word "we."

31

160.    On information and belief, Defendants and their co-conspirators shared the object to be accomplished of improperly profiting from short positions by manipulating the market to cause Farmland Partners' stock price to decline.

161.    On information and belief, Defendants and their co-conspirators had a meeting of the minds on the object to be accomplished, agreeing to cause Farmland Partners' stock price to decline so they would profit illegally from short positions through a "short-and-distort" scheme involving the publication of the Article and related Twitter comments regarding Farmland Partners and related market manipulation.

162.    On information and belief, Mathews and QKM, L.L.C. undertook the unlawful overt act of publishing, or causing to be published, a false, misleading, defamatory, and/or disparaging article about Farmland Partners and related comments on Twitter, for purposes of causing a decline in Farmland Partners' stock price constituting defamation, disparagement, intentional interference with prospective business relations/advantage, violation of the Colorado Consumer Protection Act, and securities fraud/market manipulation that unjustly enriched Defendants.

163.    Farmland Partners was proximately harmed in Colorado by the publication of the Article and the @RFortunae statements on Twitter.

## FIFTH CLAIM FOR RELIEF
### (Defamation)
*First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, and John/Jane Does 1–10*

164.    Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

165.    Defendants and their agents, co-conspirators, and/or accomplices maliciously, intentionally, knowingly, and/or recklessly published, or caused to be published, false and

defamatory written statements about Farmland Partners that held Farmland Partners up to contempt or ridicule.

166.    On information and belief, Defendants and their agents, co-conspirators, and/or accomplices knew that the written statements about Farmland Partners were false, or made those statements or caused them to be made with reckless disregard as to their veracity, by, for example, personal attacks on Paul Pittman, Farmland Partners' Chairman and CEO, among other things.

167.    On information and belief, Defendants and their agents, co-conspirators, and/or accomplices knew that the written statements about Farmland Partners would hold Farmland Partners up to contempt or ridicule.

168.    The false and defamatory written statements published about Farmland Partners were read by members of the public, including holders of Farmland Partners' stock and current and prospective business partners of Farmland Partners.

169.    The false and defamatory written statements published about Farmland Partners implied the existence of undisclosed defamatory factual predicates.

170.    The false and defamatory written statements on Twitter implied that both the Article and statements made on Twitter about Farmland Partners were based on undisclosed defamatory factual predicates.

171.    On information and belief, the false and defamatory written statements about Farmland Partners were understood to be assertions of fact or based on undisclosed factual predicates by members of the public, including holders of Farmland Partners' stock, and current and prospective business partners of Farmland Partners.

172.    Farmland Partners suffered harm in Colorado, including harm to its reputation; loss of business, in-progress business partnerships, profits and growth, and employees; increased costs; and other monetary harm as a result of Defendants' and their agents', co-conspirators', and/or accomplices' causing the publication of false and defamatory written statements.

173.    The false and defamatory written statements are defamation per se because they wrongly impute professional misconduct by Farmland Partners that is incompatible with Farmland Partners' business.

### SIXTH CLAIM FOR RELIEF
**(Unjust Enrichment/Money Had and Received)**
*All Defendants*

174.    Farmland Partners incorporates by reference the preceding paragraphs of this Complaint.

175.    Defendants realized a benefit through the taking of an undue advantage at Farmland Partners' expense.

176.    Defendants and their agents, co-conspirators, accomplices, and/or investment advisors caused Farmland Partners' stock price to decline via market manipulation involving the shorting of Farmland Partners' stock and intentionally, knowingly, and/or recklessly participating or acquiescing in the deceitful, misleading, market-manipulative act of publishing false, misleading, defamatory, and/or disparaging information about Farmland Partners.

177.    The Fund and Dilling realized gains on their short positions in Farmland Partners' stock instead of losses when the price declined following the publication of false, misleading, defamatory, and/or disparaging information about Farmland Partners.

178.    First Sabrepoint received an increased management fee based on the Fund's profits on its short positions in Farmland Partners' stock when the price declined following the

publication of false, misleading, defamatory, and/or disparaging information about Farmland Partners.

179.    The Fund's General Partner received an increased performance allocation based on the Fund's profits on its short positions in Farmland Partners' stock when the price declined following the publication of false, misleading, defamatory, and/or disparaging information about Farmland Partners.

180.    Baxter and Marchiony shared in the Fund's General Partner's increased performance allocation based on the Fund's profits on its short positions in Farmland Partners' stock when the price declined following the publication of false, misleading, defamatory, and/or disparaging information about Farmland Partners.

181.    Defendants' gains were at Farmland Partners' expense in Colorado because they were realized as a result of Farmland Partners being harmed by false, misleading, defamatory, and/or disparaging information in multiple ways, including a decline in its stock price, harm to its reputation, and the loss of business opportunities.

182.    It would be unjust and unconscionable under the circumstances for Defendants to retain the gains they realized at Farmland Partners' expense, which in equity and good conscience belong to Farmland Partners, without just compensation to Farmland Partners.

## PRAYER FOR RELIEF

WHEREFORE, Farmland Partners requests that the Court grant the following relief:

1.    Enter Judgment in favor of Farmland Partners, and against Defendants, on all Claims for Relief Farmland Partners asserts in this Complaint;

2.    Award Farmland Partners damages incurred as a result of the false, misleading, defamatory, and disparaging statements about Farmland Partners;

3.      Award Farmland Partners attorney fees and costs, as available;

4.      Award Farmland Partners injunctive relief to prevent further, irreparable harm from the false, misleading, defamatory, and disparaging statements about Farmland Partners;

5.      Award Farmland Partners prejudgment and post-judgment interest; and

6.      Award Farmland Partners all other relief to which it may be entitled, including treble damages.

Farmland Partners reserves the right to make amendments to this Complaint as it discovers new information, including, but not limited to, (a) amending the Complaint to reflect the true identities of John/Jane Does 1–10, (b) adding new claims, (c) adding a claim for exemplary damages following appropriate disclosures and further proceedings, and/or (d) adding new defendants, including those working with or for Defendants, such as members, partners, affiliates, employees, consultants, clients, agents, relatives, and/or counsel of or for Defendants.

Plaintiff demands a trial by jury for all issues so triable.

Dated: June 7, 2021

Respectfully submitted,

*/s/ E. Leon Carter*

E. Leon Carter
Texas Bar No. 03914300
lcarter@carterarnett.com
J. Robert Arnett
Texas Bar No. 01332900
barnett@carterarnett.com
Courtney Barksdale Perez
Texas Bar No. 24061135
cperez@carterarnett.com
**CARTER ARNETT PLLC**
Campbell Centre II
8150 N. Central Expressway, Suite 500
Dallas, Texas  75206
(214) 550-8160

**ATTORNEYS FOR PLAINTIFF FARMLAND PARTNERS INC.**

# EXHIBIT A

Seeking Alpha$^{\alpha}$

# Farmland Partners: Loans To Related-Party Tenants Introduce Significant Risk Of Insolvency - Shares Uninvestible

Jul. 11, 2018 8:30 AM ET23 comments | 6 likes
by: Rota Fortunae

**Summary**

- We believe FPI is artificially increasing revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent; 310% of 2017 earnings could be made-up.

- FPI has neglected to disclose that the majority of its loans have been made to two members of the management team, including Jesse Hough, CEO Paul Pittman's long-time business partner.

- A UCC shows "Pittman Hough" pledged shares of FPI for a loan then FPI's stock fell 30%, and two weeks after reaching an all-time low, FPI began lending to Hough.

- Four board members and FPI's president have resigned since FPI began lending to Hough, and in March, FPI dismissed its auditor.

- We found evidence that strongly supports FPI has significantly overpaid for properties; under normal circumstances, we estimate FPI is worth $4.85/share, but we think the shares are uninvestible.

*Please read the full disclaimer at the end of the report before reading further. This report represents the opinion of the author. Investors should do their own due diligence and come to their own conclusions.*

> *"We are not going to engage in a window-dressing process for Wall Street. We have great value in our assets… the market is going to figure this out and the roughly 10% short in our stock are going to get killed, and I'll be cheering the day it happens." - CEO, Paul Pittman on 1Q2018 Call*

# Introduction

Chapter five of Financial Shenanigans teaches investors the methods companies use to artificially increase revenues. One technique is to sell a product to a friendly customer who has no real obligation to pay. Such a transaction is said to lack economic substance. And how do you trick the auditor? Draft a normal sales contract but have a secret "side agreement" that modifies the terms. We think this is happening at Farmland Partners.

Farmland Partners (FPI) is a highly levered farm REIT whose cash flow does not cover its dividend and whose non-GAAP earnings have drifted miles away from economic reality. Yet, despite evidence that rents have fallen across key geographies, FPI just posted its largest ever same-property revenue (i.e. same-store sales) increase and notched its longest stretch of positive revenue surprises. To be blunt, we do not believe the numbers.

When we started looking into FPI, we found it was playing classic accounting games like capitalizing part of the expense to lease CEO Paul Pittman's personal jet and excluding farms from its same-property rent number. But it was not until we reviewed hundreds of deed records in dozens of counties across the country that we came to believe that FPI faces a significant risk of insolvency.

**Our research leads us to believe that FPI is using its mortgage-lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest revenue. We believe these loans lack economic substance because, whenever they come due, FPI happens to acquire the property collateralizing the loan, like a bank buying a house at full price when the mortgage matures.**

**And the transactions follow a pattern, whereby FPI makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and, days later, lends more money to the borrower/new tenant. In total, we believe up to 6% of 2017 revenues and 310% of 2017 net income could be the result of transactions that are just moving money from one side of the desk to the other.**

While FPI discloses its loans, it has neglected to disclose that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough (both FPI tenants and members of FPI's management team). Ryan Niebur is a now-bankrupt tenant (not

disclosed), who after defaulting on an FPI loan (not disclosed) was bailed out when FPI acquired his properties, falsely reported the purchase as a loan and then lent him an additional $61,800 the day after he signed a lease with FPI for $61,750.

Jesse Hough is Paul Pittman's long-time business partner, the co-founder of FPI and an FPI consultant. In July 2017, FPI made a loan secured by one of Hough's properties, which FPI then acquired two weeks before the loan matured and leased back to him just days before FPI lent him another $5.25 Million, this time as the president of an inactive entity that corporate records show he has no affiliation with, and that is secured by land that deed records show he does not own.

Our opinion that FPI appears to be playing accounting games is further bolstered by a Colorado UCC filing that shows "Pittman Hough" pledged shares of FPI for a bank loan just days before FPI signed an agreement that Pittman later stated he thought would drive the stock price higher. He was wrong. Instead the stock tanked, and two weeks after hitting an all-time low, FPI made its first loan to Jesse Hough.

**While shareholders have expressed concern about FPI's ability to maintain its dividend, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but also faces a significant risk of insolvency.**

And it appears that we are not the only concerned party. Since making its first loan to Jesse Hough in July 2017, four board members and FPI's president have resigned. And in March, FPI dismissed PWC for EKS&H (auditor for MusclePharm and Heska).

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares carry significant downside. We found evidence that suggests FPI has significantly overpaid for properties. We estimate that under normal circumstances FPI would be worth $4.85 per share (45% below the current stock price). But there is never just one cockroach, and we have no confidence in FPI's financials. Accordingly, we think FPI is uninvestible.

*Note: We reached out to FPI's management with a list of questions (located at the end of*

*this report). The company did not respond.*

*Note that while the related parties discussed herein may fail to meet the SEC's definition, we believe they meet the more stringent definition set out by audit rules, and more importantly, we think the relationships would be considered material information to most investors.*

## FPI's Capital Market Hamster Wheel

From its IPO through 2017, FPI generated *negative $3.2 Million* in cumulative free cash flow (operating cash flow - depletion/depreciation - preferred dividends). And this figure excludes an additional $69 Million in capital expenditures that FPI says are all growth related, an incredulous statement given the lack of organic growth.

And FPI ignores very real expenses when it promotes adjusted funds from operations (AFFO). Excluded expenses include the dividend on FPI's preferred "B" shares, which at 6% of par value is higher than the companies blended cap rate of 4.25% (pg. 13). Accordingly, AFFO has drifted miles away from free cash flow as the recession in the ag economy has deepened.



*Source: Chart By Author, Using SEC Financials*

In simple terms, millions in executive pay (including $0.5 Million for leasing Pittman's personal jet) and $27 Million in dividends has been funded, not by profits, but by a hamster wheel of dilutive debt and equity raises.

**The fact that FPI generates no cash is very important to remember. If our thesis is correct, the related-party loans are being "paid off" by FPI, and capital from new investors is funding the related revenues.**

That makes this accounting maneuver particularly hard to detect because, unlike channel stuffing, there is no build up in receivables or decline in operating cash flow to forewarn investors. No, in this case, the red flags came in the form of hard-to-believe numbers that we could not reconcile with reality.

## Something Is Not Adding Up

For years, Paul Pittman has been making incredulous statements about the prospects for flat-to-increasing rents even though farm (i.e. tenant) incomes have been declining since 2013. On the 2Q2015 call, he said:

> We're not really very worried about this rent roll issue. I mean, our perspective is that we will have, **virtually under any economic scenario**, we will either have flat or increasing rents in those discussions. And it comes back to the fact that the farmer takes a long-term view, right?

And in the beginning of 2017, Pittman said:

> We've probably seen a portfolio-wide, same-store sales basis, and this will surprise a lot of people, but about 1.5% to 2% increase across the board… there are a few regions of the country… particularly in Illinois and eastern Nebraska… those rents are generally coming down…,you're seeing them come down but not massively, but their off in the 5-ish percent kind of range.

Pittman's comments do not jive with well-publicized industry data. The Illinois Society of Professional Farm Managers and Rural Appraisers (pg. 49) shows Illinois cash rents are down approximately 25% from 2013 (pg. 49). And the 2017 Nebraska Farm Survey (pg. 50) shows cash rents on irrigated cropland across Nebraska are down 24% since 2013 and down 18% in eastern Nebraska.

**So, we were not surprised when, in the 1Q2017, average annual rent per acre fell off a cliff when FPI's original three-year leases rolled over. But we were surprised when the number began to improve throughout the year and when, in the 4Q2017, FPI stopped disclosing the figure completely and simply reported that rents on row crops were "flat to slightly lower" (pg. 52).**



*Source: Chart By Author, Using SEC Filings (Search: "same-property")*

On the 2Q2017 conference call, management said the improvement was due to leases moving from straight cash rent to cash plus crop share and farmers locking in prices during the run up over the summer. Perhaps, but this must assume that FPI's tenants had the foresight to sell the vast majority of their crops in the short period of time when prices peaked because shortly after prices fell, and average prices for row crops ended down for the year.



*Source: Bigcharts.com*

And given that prices were hitting fresh lows in early 2018, we doubt farmers were willing to sign leases that allowed FPI to report +15% same-property revenue growth in the 1Q2018 (FPI's highest ever year-over-year gain).

We think the first quarter surge was, in part, due to how FPI defines "same property" as those that are "owned and operated" for the entirety of both periods. Only including "operated" farms means that FPI can exclude properties that are not leased, which skews the financial picture of the entire portfolio.

And sure enough that is exactly what we found FPI doing. The chart below shows that in the 1Q2018, FPI excluded 6.5% of the properties owned for the entirety of 1Q2017 (note FPI does not provide figures in 10-Ks to make the fourth quarter calculations).

| Same-Property Acres | 1Q2017 | 2Q2017 | 3Q2017 | 1Q2018 |
|---|---|---|---|---|
| Current Year Acres | 74,420 | 107,206 | 110,828 | 109,270 |
| Comparable Period Acres | 74,267 | 107,052 | 110,675 | 116,424 |
| Implied Non-Operating Acres | 153 | 154 | 153 | -7,154 |
| % Of Total Same-Property Acres | 0.2% | 0.1% | 0.1% | -6.5% |

*Source: Chart By Author, Using SEC Filings and IR Investor Presentations*

But it was not until we reviewed hundreds of deed records across the country that came to believe FPI is using its mortgage lending program to artificially increase revenues by making loans to related-party tenants who round-trip the cash back to FPI as rent and interest revenue.

## *The FPI Loan Program*

In August 2015, Farmland Partners introduced the FPI Loan Program to "address a market need created by short term cash flow pressure on farmers who otherwise *maintain solid balance sheets*" but cannot get traditional funding. The press release promoted FPI's quick underwriting abilities and *conservative loan-to-value criteria*. Further disclosure given in the 3Q2015 10-Q (pg. 21) states "the company intends to make loans to *third-party* farmers (both tenant and non-tenant)."

Below we present a chart of the loan program's originations (in boxes), the borrower (where known) and the ongoing balances.



| FPI Loans | Borrower | 3Q2015 | 4Q2015 | 1Q2016 | 2Q2016 | 3Q2016 | 4Q2016 | 1Q2017 | 2Q2017 | 3Q2017 | 4Q2017 | 1Q2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Loan #1 | Boersen Land Co. | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 | 1,800,000 |
| Loan #2 | Ryan Niebur | | 980,000 | 980,000 | 980,000 | 980,000 | 980,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 |
| Loan #3 | ? | | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loan #4 | Ryan Niebur | | | | | | | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 | 2,194,000 |
| Loan #5 | ? | | | | | | | | 1,647,000 | 1,647,000 | 1,647,000 | 1,647,000 |
| Loan #6 | Jesse Hough | | | | | | | | | 100,000 | 100,000 | 0 |
| Loan #7 | Jesse Hough | | | | | | | | | 669,000 | 669,000 | 0 |
| Loan #8 | Justice Farms (?) | | | | | | | | | | 2,700,000 | 0 |
| Loan #9 | Jesse Hough | | | | | | | | | | | 5,250,000 |
| Revenue Beat / Miss | | BEAT | BEAT | MISS | MISS | BEAT | BEAT | MISS | BEAT | BEAT | BEAT | BEAT |

*Source: Chart By Author, Using SEC Filings, Deed Records and FactSet*

Off the bat, this struck us as an accountant's version of the devil's playpen. How are investors to know whether FPI is making loans to struggling tenants so they can pay rent they otherwise would be unable to pay. And we noticed that FPI has missed revenue estimates only once in a quarter when it also originated a loan.

And then, we found that FPI has neglected to disclose that $9.2 Million (out of a total of $15.4 Million) in loans have been made to Ryan Niebur and Jesse Hough, who are both members of FPI's management team. We believe these loans lack economic substance and have been used to artificially increase revenues.

Publicly available documents show that FPI has engaged in a pattern of transactions where it makes a loan against a property, acquires the property around the time the loan matures, enters into a lease with the borrower, and days later lends more money to the borrower/new tenant.

## The Ryan Niebur Loans (Loans #2 & #4)

On October 30th, 2015 (recorded in deed records and SEC filings as November 16th, 2015), FPI lent $980 Thousand (Loan #2) to a tenant farmer (pg. 51). The only other disclosure (pg. F-23) was that the loan was collateralized by a first mortgage on farm real estate and that the first year of interest was due up front (allowing FPI to report immediate interest revenue).

What was not disclosed was that the loan was made to Ryan Niebur and that it was not used for farming operations but rather to pay off part of an existing mortgage.



*Source: Washington County, CO Deed Records*

Niebur's loan remained unchanged until the 1Q2017 10-Q (pg. 16) when FPI disclosed that it "renegotiated" the loan while simultaneously entering into a new $2.194 Million loan (Loan #4) collateralized by two additional properties.

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
| | | March 31, 2017 | December 31, 2016 | |
|---|---|---|---|---|
| Mortgage Note [1] | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note [2] | Principal & interest due at maturity | 240 | 980 | 3/16/2022 |
| Mortgage Note [2] | Principal & interest due at maturity | 2,194 | - | 3/16/2022 |
| Total outstanding principal | | 4,234 | 2,780 | |
| Points paid, net of direct issuance costs | | (3) | (4) | |
| Interest receivable (net prepaid interest) | | 16 | 67 | |
| Total notes and interest receivable | | $ 4,247 | $ 2,843 | |

(1)  In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. The Company is currently in negotiations to extend the terms with the borrower.

(2)  The original note was renegotiated and a second note was entered into simultaneously, with the borrower during the quarter. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

*Source: FPI 1Q2017 10-Q (pg. 16)*

**But this is not the real story. FPI did not disclose that on March 16th, 2017, it acquired the Andersons Farm from Niebur which was collateral for Loan #2, and in which the deed specifically states that Niebur was in default on the loan and obligated to pay a remaining balance of $240 Thousand (Loan #2's balance as of 1Q2017).**



*Source: Washington County, CO Deed Records & Appraisal District*

Then, in January 2018, Neibur filed for bankruptcy, a material fact that we could not find in FPI's SEC filings. Court records shows that the remaining $240,000 owed is collateralized by a property worth $192,000, resulting in a loan-to-value ratio of 125%. We hardly call this conservative.



*Source: Pacer - Case #1:2018bk10568 - Document #17 Schedule A/B*

We believe the transactions with Niebur show FPI's willingness to make loans outside of the programs stated parameters and stabilize rental income by making risky loans to struggling tenants. But, more importantly, we believe the loans show that FPI has misstated its SEC filings and used the loan program to artificially increase revenues.

## Loan #4 Was An Acquisition, Not A Loan

It turns out that the new $2.194 Million loan to Niebur was not actually a loan, but an acquisition of three properties, all on March 16th, 2017. As shown above, FPI acquired one of the properties collateralizing Niebur's original loan for $801,800. The other two are the same properties that purportedly collateralize the new loan. Deed records show FPI acquired these properties for $1.392 Million.

Low and behold, the total acquisition price is $2.194 Million (= 0.802 + 1.392), the same amount as Loan #4. Further proof that there was no new loan, is the fact that Niebur did not list Loan #4 in his bankruptcy, only the remaining $240,000 of Loan #2.

### Loan #4 ($2.194 Million) Is Actually An Acquisition Of Three Properties



*Source: Kit Carson County & Washington County, CO Deed Records*

So, in fact, FPI reported a loan on its financial statements when it actually was an acquisition. But that is not all. After Neibur defaulted and on the same day FPI acquired his properties, FPI lent him an additional $61,800 that we believe was used to immediately pay rent on a new FPI lease.

## *Niebur's Loan For Rent*

Looking at the cash flow statement below, 'Principal Receipts On Notes Receivable' of $801,000 is the partial repayment (rounded down) of Loan #2 that was funded by the $801,800 received for the acquisition of the property collateralizing Loan #2. But this repayment would leave a balance of $178,200 vs. the reported $240,000.

The $61,800 difference is the same as the difference (rounded) between the $2.255 Million Issuance of Note Receivable reported in the cash flow statement and the $2.194 Million Loan #4.

| CASH FLOWS FROM INVESTING ACTIVITIES | | |
|---|---:|---:|
| Real estate acquisitions, net of cash acquired | (79,220) | (93,187) |
| Real estate and other improvements | (3,947) | (698) |
| Principal receipts on notes receivable | 801 | 50 |
| Issuance of note receivable | (2,255) | — |
| Net cash used in investing activities | (84,621) | (93,835) |

*Source: FPI 1Q2017 10-Q*

So, after Niebur defaulted on Loan #2 and on the same day FPI acquired his properties, allowing him to partially repay, FPI lent Niebur an additional $61,800. And according to records in Niebur's bankruptcy, FPI entered into a lease on March 15th, 2017, that stated the first annual rent payment of $61,750 was due on March 16th, 2017, the day FPI lent him the money.



*Source: Pacer - Case #1:2018bk10568 - Document #90-2*

We know this was a mountain of numbers, so below is a picture showing the three transactions.



*Source: Chart By Author, Using SEC Filings & Deed Records*

There are two important takeaways:

1. **The partial payoff of Loan #2 was funded by FPI's acquisition of a property collateralizing the loan. We believe this means the loan lacked economic substance and is akin to a bank paying full price to acquire a home securing a defaulted mortgage and then calling the loan money good when the borrower uses the sale proceeds to pay off the loan.**
2. **Second, because Niebur was already in default when FPI lent him the additional $61,800 on the same day he owed $61,750 in rent, we think this transaction artificially increased revenues by allowing a defaulted tenant/borrower to pay his rent.**

Given the evidence that FPI has used the loan program to prop up a struggling tenant and, we believe, issue a loan to artificially increase revenues, shareholders should be concerned with the similar pattern of transactions with Jesse Hough.

## Who Is Jesse Hough?

Paul Pittman and Jesse Hough have been business partners since at least January 2012 when, according to SEC filings (pg. F-50), Pittman-Hough Farms, LLC was formed as a merger of their personal farmland holdings. They were also partners in a web of businesses that FPI hired for service before and after the IPO.

Two of the entities are Astoria Farms and Hough Farms, which were FPI's first tenants (pg. 17), are currently controlled by Jesse Hough (pg. 20) and, as of December 2017, still lease 4% of FPI's acres (pg. F-19). Another entity was PHS Holdings, which leased land and equipment to FPI (pg. F-63), but has not been mentioned in FPI's SEC filings in years.

After the IPO, Jesse Hough became an FPI consultant, but according to an August 2016 investor presentation, he is considered part of the management team (we found no newer investor presentations that removed his name).

## The Jesse Hough Loans (Loan #6)

On July 25th, 2017, FPI made a $100,000 loan to Jesse Hough through PHS Holdings. Like the original loan to Ryan Niebur (Loan #2), we think this loan was likely paid off with the proceeds from FPI acquiring the property. Deed records show FPI acquired the property on January 12th, 2018, two weeks before the January 31st, 2018 maturity date (pg. 17).



*Source: Butler County, NE Deed Records*

While we cannot be sure that the acquisition paid off the loan, an inconsistency in FPI's SEC disclosure bolsters our opinion that details are being misreported. The 1Q2018 10-Q (pg. 16) states the loan was fully settled "on the maturity date of January 1, 2018," (before the acquisition closed) but the disclosure listed right above states the original maturity date of January 31st, 2018.

As of March 31, 2018 and December 31, 2017, the Company had the following notes receivable:

| ($ in thousands) Loan | Payment Terms | Principal Outstanding as of | | Maturity Date |
|---|---|---|---|---|
| | | March 31, 2018 | December 31, 2017 | |
| Mortgage Note [1] | Principal & interest due at maturity | $ 1,800 | $ 1,800 | 1/15/2017 |
| Mortgage Note [2] | Principal & interest due at maturity | 240 | 240 | 3/16/2022 |
| Mortgage Note [2] | Principal due at maturity & interest due monthly | 2,194 | 2,194 | 3/16/2022 |
| Mortgage Note [6] | Principal & interest due at maturity | 1,647 | 1,647 | 4/27/2018 |
| Mortgage Note [3] | Principal & interest due at maturity | - | 100 | 1/31/2018 |
| Mortgage Note [4] | Principal due at maturity & interest paid in advance | - | 669 | 2/15/2018 |
| Mortgage Note [5] | Principal due at maturity & interest paid in advance | - | 2,700 | 1/29/2018 |
| Mortgage Note | Principal & interest due at maturity | 5,250 | - | 8/19/2020 |
| Total outstanding principal | | 11,131 | 9,350 | |
| Points paid, net of direct issuance costs | | (1) | (6) | |
| Interest receivable (net prepaid interest) | | 609 | 461 | |
| Provision for interest receivable | | (91) | (45) | |
| Total notes and interest receivable | | $ 11,648 | $ 9,760 | |

(1)   In January 2016, the maturity date of the note was extended to January 15, 2017 with year one interest received at the time of the extension and principal and remaining interest due at maturity. On July 28, 2017, the Company notified the borrower of default under the Promissory Note. The Company currently believes that collectability is reasonably assured as the fair value of the mortgaged farm is greater than the amount owed under the loan.

(2)   The original note was renegotiated and a second note was entered into simultaneously with the borrower during the three months ended March 31, 2017. The notes include mortgages on two additional properties in Colorado that include repurchase options for the properties at a fixed price that are exercisable between the second and fifth anniversary of the notes by the borrower.

(3)   The note was fully settled and outstanding amounts paid on the maturity date of January 1, 2018.

(4)   The note was fully settled and outstanding amounts paid on the maturity date of February 2, 2018.

(5)   The note was fully settled and outstanding amounts paid on the closing of an acquisition in North Carolina, which was completed on January 12, 2018.

(6)   On April 17, 2018, the Company amended the loan to extend the term of the loan through March 1, 2020 and increased the interest rate to 7.5% per annum.

*Source: 1Q2018 FPI 10-Q*

**If the acquisition paid off the loan, we think this would qualify as a loan that lacks economic substance.**

But there is another important similarity to the Niebur transactions. Deed records show that PHS Holdings entered into a lease agreement with FPI as part of the acquisition agreement.

**June 14th, 2018 Subordination Agreement (Butler County, NE) Shows FPI Enters Lease With PHS Holdings**

SUBORDINATION AGREEMENT

THIS SUBORDINATION AGREEMENT ("Agreement") is dated as of the 6th day of May, 2018, and is by PHS Holding LLC, an Illinois limited liability company with principal offices at 900 E. Louisiana Ave, Suite 209, Denver, CO 80210 (the "Subordinating Party"), and Cottonwood Valley Land, LLC, or assigns, a Nebraska limited liability company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 ("CVL"); Attention: Chief Financial Officer and BRIGHTHOUSE LIFE INSURANCE COMPANY, a Delaware corporation, on behalf of itself, and any of its subsidiaries, affiliates, successors and assigns with an interest in the Loan (defined herein, individually and collectively the "Lender").

WITNESSETH

WHEREAS, CVL intends to obtain a loan from the Lender (the "Loan").

WHEREAS, the Loan will be secured, without limitation, by a first mortgage or deed of trust on the real estate located in Butler County, Nebraska, and described on Exhibit A, attached (the "Land") together with all improvements located on the Land and other real and personal property described therein (collectively, the "Mortgaged Property"; and that mortgage or deed of trust granted by CVL to the Lender, as it is now or may hereafter be amended, modified or restated in its entirety, the "Security Instrument");

WHEREAS, the Subordinating Party has certain repurchase rights as provided in the real estate purchase agreement between the Subordinating Party, as "Seller" and CVL, as "Buyer" signed and effective on December 20, 2017(that agreement, as amended, the "REPA"); specifically providing as follows (the "Repurchase Rights"):

7.     Additional Provisions.

a.    Repurchase Option and Deadline. On the third, fourth and fifth anniversary of this Agreement [as defined in the REPA] (the "Repurchase Option Deadline") Seller shall have the option to repurchase the Property [as defined in the REPA](the "Repurchase Option") for a total consideration (the "Repurchase Price") equal to the sum of: (a) the Purchase Price (defined in the REPA) multiplied by 1.093 if exercised on or prior to the third anniversary [of the REPA], or 1.126 if exercised on or prior to the fourth anniversary [of the REPA] or 1.159 if exercised on or prior to the fifth anniversary [of the REPA] and , (b) the Total Investment made from the Effective Date [as defined in the REPA] through the Repurchase Option Deadline by Buyer for any improvements multiplied by 1.08. The "Total The "Total Investment" at any time will equal the actual out-of-pocket costs Landlord [Buyer] and its affiliates incurred in arms-length transactions with third parties in connection with Landlord's [Buyer's] development of the Farm [defined in the REPA]. The Total Investment will be determined in good faith by Landlord [Buyer], provided however that Landlord [Buyer] will provide Tenant [Seller] with such evidence of the Landlord's [Buyer's] determination of the Total Investment as Tenant [Seller] may reasonably require. Failure of the Seller to comply with any term of this Agreement [defined in the REPA] or the Linwood Farm Lease Agreement [as defined in the REPA] will immediately terminate the Seller's Repurchase Option. Upon such termination, Seller agrees, upon the request of the Buyer, to do, execute, acknowledge and deliver such other acts, consents, instruments, documents and other assurances as may be reasonably necessary to terminate the rights set forth in Section 7(a) [of Exhibit B to the REPA]. The decision to exercise the Repurchase Option shall be communicated to Buyer no later than six months prior to the applicable Repurchase Option Deadline ("Repurchase Notification Deadline"). Buyer shall then have 30 days to provide Seller with an estimate of the Repurchase Price. Within ten (10) days of receipt of the Repurchase Price, Seller shall make a non-refundable down payment equal to 15% of the estimated Repurchase Price.

PHS HOLDINGS LLC

By: _____

Name: _Jesse Hough_

Title: _Manager_

Date: _5-31-18_

*Source: Butler County, NE Deed Records*

And just six days after the property was acquired (and presumably the lease went into effect), FPI lent $5.25 Million to Hough under circumstances that, in our opinion, are highly irregular.

## The Jesse Hough Loans (Loan #9)

On January 18th, 2018 (pg. 16), FPI made a $5.25 Million loan to Siffring Farms. Nebraska corporate records show that Siffring Farms is an inactive LLC whose president is Duane R. Siffring. However, the deed of trust for the loan was signed by Jesse Hough as President of Siffring Farms.



*Source: Butler County, NE Deed Records (Search: Siffring Farms)*

And Butler County appraisal records (search: Siffring Farms) show that Siffring Farms has owned the properties for years.

**We ask, why is Jesse Hough signing on a loan for an inactive entity, that corporate records show he has no affiliation with, and that is collateralized by land that deed records show he does not own?**

Based on the circumstances in which this loan was made and the fact that it was made just days after FPI entered into a lease with Jesse Hough (through PHS Holdings), we think there is a significant probability that part of the $5.25 Million was used to pay PHS Holdings' annual rent payment.

We also think there is a significant probability that part of the proceeds was used to roll over another loan made to Jesse Hough.

***The Jesse Hough Loans (Loan #7)***

Go back to August 25th, 2017, and FPI made a $669,000 loan to Jesse Hough through Hough Farms.

**FPI Lends Jesse Hough $669,000 Thru Hough Farms**



Source: Butler County, NE Deed Records

According to the 10-Q disclosure above, this loan was paid-off on February 2nd, 2018 (we note that again the original maturity date of February 15th does not match this disclosure). In any event, the loan was paid off just weeks after FPI gave Hough the $5.25M loan through Siffring Farms, which introduces the possibility that this loan was simply rolled into a new loan.

We also note that we could not find any filed reconveyances in the deed records, which is the normal public filing a bank uses when a borrower pays off a loan.

## Are The Borrowers/Tenants Paying Above-Market Rents?

When Ryan Niebur sold his properties to FPI, he entered into two lease agreements. The first agreement, previously discussed, had an annual rent payment of $61,750 for 334.4 tillable acres or $185 per acre. This is 29% above the $143 average cash rent per acre for irrigated farmland cited in this 2017 Colorado Farm Land Values & Rents Survey (in line with what the USDA reported in its annual survey.)

We note that the lease includes $20,000 for a building, which if you exclude would bring the lease rate to $125 per acre, or less than the average. However, we think this is the incorrect way to look at the lease. First, farms often come with buildings and equipment, that is why survey's report average rent.

Second, FPI's second lease also appears to be above market. The lease has an annual rent payment of $26,160 for 628.3 acres or $42 per acre.

**FPI Signs Lease With Ryan Niebur For $26,160 Due On The Day FPI "Renegotiates" Loan #2**



**FARM LEASE – NIEBUR WASHINGTON COUNTY FARM**

THIS LEASE AGREEMENT (the "**Agreement**") is made and entered into as of the date of the last signature (the "**Effective Date**"), by and between FPI Burlington Farms LLC, a Delaware limited liability company with principal offices at 4600 S. Syracuse St., Suite 1450, Denver, CO 80237 (the "**Landlord**"), and Ryan B. Niebur and Stacie K. Niebur whose address is ███████████████ (the "**Tenant**").

The parties agree to the following:

1. **Description of the Property.** Landlord leases to Tenant, for the purpose of producing agricultural crops only, the real property described in Exhibit A together with all improvements thereon ("**Improvements**"), all appurtenances and all hereditaments (collectively, the "**Farm**"). This Agreement is for 628.3 tillable acres. Landlord shall have the right to lease or sell a portion of the Farm for non-farming purposes. In case of such sale or lease of acreage, Landlord will reimburse Tenant for any lost crop revenues for the year in which such reduction occurs and will reduce rents in future years on a pro rata per acre basis.

2. **Term of Agreement.** The lease period begins on March 16, 2017 and ends on November 30, 2021, unless terminated earlier in accordance with Section 11 of Exhibit B or otherwise provided in this Agreement.

3. **Rental Payments.** The annual rent for the Farm shall be $26,160 due and payable in full for each calendar year during the term of the Agreement. The first year's rent will be due on March 16, 2017 and rent shall be due on March 15th of each subsequent year of the Agreement. Although the last year of this lease ends on November 30 which is less than a full calendar year Tenant shall pay $26,160 for the period of March 15 to November 30, 2021. In the event the cash rent is not paid in full by the due date(s), Tenant agrees to pay interest on the amount of unpaid rent at an interest rate equal to the higher of ten percent (10%) per annum or two percent (2%) above the prime interest rate then published by the Wall Street Journal but not to exceed the highest rate permitted by law. The first year's rent in the amount of $26,160 shall be paid on March 16, 2017 from proceeds of Tenant's real estate sale on March 16, 2017.

*Source: Pacer - Case #1:2018bk10568 - Document #90-1*

As evidenced in the Washington County Deed Records (Search: FPI Burlington Farms), this land is coded "DF" or "dry-farmland." The abovementioned survey and USDA data both say average cash rents for non-irrigated farmland in Colorado are $30 per acre. This suggests FPI's lease is 40% above average market.

We also believe that, on the 1Q2015 conference call, Paul Pittman admitted to charging above-market rents to related-party tenants (most likely Astoria Farm and Hough Farms):

> *the only real renewals we had last fall were with a related party. So, what we gave was basically a 1% rent increase in an environment, in which rents are flat to slightly down on the group of properties.*

And looking at what Astoria Farms and Hough Farms paid per acre (disclosed in 10-K's), there is evidence that they were paying above-market rents. Originally, Astoria and Hough Farms leased Pittman and Hough's legacy properties in Nebraska and Illinois. The table below shows a significant jump in rent per acre in 2016. We believe this jump was not all increases, but largely dropping the leases in Nebraska (which we think get picked up by other Hough entities) and maintaining the leases in Illinois, a state with significantly higher lease rates. Additionally, the 7,026 acres in Illinois are very close to the legacy Illinois acreage.

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Total FPI Acres | 46,460 | 74,267 | 115,489 | 159,983 |
| % Lease To Astoria/Hough | 62.30% | 20.10% | 6.08% | 4.00% |
| Acres Leased To Astoria/Hough | 28,945 | 14,928 | 7,026 | 6,399 |
| Rent Paid | $2,474,839 | $2,720,758 | $2,464,905 | $2,000,000 |
| Implied Rent per Acre | $86 | $182 | $351 | $313 |

*Source: Chart By Author, Using SEC Filings*

If our assumption is correct, the $351 per acre is 8% higher than cash rents on the top-third of "excellent" farmland reported in the 2017 Illinois Farmland Values and Lease Trends Report (pg. 46). We note that the difference may be that FPI is getting cash plus crop share, but we found no evidence that is the case.

**What is interesting though is that the implied cost per acre paid by Hough Farms and Astoria Farms actually decreased 11% in 2017. This flies in the face of Pittman's comments that lease rates in Illinois are down in the "5-ish range."**

And while this fact may appear to refute our thesis, remember FPI is now leasing properties in Nebraska to Jesse Hough through PHS Holdings, a fact that we could not find in FPI's SEC filings. And we also believe there is another entity Jesse Hough may be using.

On January 9th, 2018, eight days before he received the $5.25 Million Siffring Farm loan, Hough incorporated H-KO Land & Cattle Company in Nebraska. And the address listed on the corporate records is the same address the Butler County appraisal records have for the Siffring Farm properties.



*Source: Nebraska Secretary of State & Butler County, NE Deed Records (Search: Siffring Farms)*

We also note that Paul Pittman recently called out Nebraska and Colorado (the two states where Niebur and Hough loans were made) as "very difficult locations."

But the loans to Niebur and Hough are not the only ones that concern us.

## Potential Loan To Large Shareholder

In the 4Q2017 (pg. F-21), FPI made a $2.7 Million loan, which in the 1Q2018 (pg. 16) FPI disclosed was "settled on the closing of a property in North Carolina on January 12, 2018."

We found the acquisition in Pasquotank County, NC (search Grantee: FPI Carolinas) with Justice Farms of North Carolina. This leads us to believe the loan was made with James C. Justice III, son of a billionaire governor and, according to SEC filings, owner of 7.3% of FPI as of February 3rd, 2017.

But the most important detail of Loan #8 is the fact that it was settled through the acquisition of a property, which again introduces the risk that the loan lacked economic substance. And again, we see a pattern similar to the Niebur and Hough transactions.

Deed records show that on December 20th, 2017 (the same day FPI and PHS Holdings entered into a similar agreement), FPI and Justice Farms entered into a "Real Estate Purchase and Farmland Lease Agreement."

**Subordination Agreement Shows FPI Enters Lease With Justice Farms**



*Source: Pasquotank County, NC Deed Records*

**This means that after FPI made the loan, it acquired a property which settled the loan and at the same time entered into a new lease. While this transaction is missing the post-acquisition loan, it is very similar to the pattern exhibited in the Niebur and Hough transactions.**

Furthermore, we estimate Loan #8, which was outstanding only for a few months, allowed FPI to record $250 Thousand in fees and interest during the 1Q2018 (pg. 37), just over the $200,000 that FPI beat revenue estimates by and represented over 6% of 1Q2018 operating income.

## Do The Property Acquisitions Count as Economic Substance?

The only legitimate argument we can think to describe away the issues of economic substance with these loans is that, in the end, FPI receives a property in lieu of cash? But we do not think this argument would hold up. First, the intent of any loan is to be repaid in principal and interest. So, if the loans are to be settled through property acquisitions, they need to be disclosed as such. Furthermore, we think a reasonable investor would want to know if FPI was acquiring properties it also lent against, as it may signal an underperforming property or tenant.

But more importantly, these transactions leave an incredible amount of room for games to

be played in non-arm's length transactions. For instance:

1. FPI could overpay for the property to fund the principal and interest payments that are due when the loan is repaid
2. FPI could overpay and the parties could split the excess proceeds without anyone knowing about it
3. FPI could overpay to fund lease payments to the seller/tenant
4. FPI could be taking dog properties off the borrowers' hand in return for helping FPI improve its financial picture

## Adding It All Up

We believe FPI lent Ryan Niebur money to pay rent after he had already defaulted on an FPI loan. Whether or not Jesse Hough used the money (directly or indirectly) to pay rent is for each investor to decide, but we think, taken together, all the evidence suggests a high probability that he did. If we are right, the question is how much did FPI benefit from the loan program in 2017?

One way to estimate that figure is to adjust full-year 2017 same-property revenues to be in line with the drop seen earlier in the year. Below is a table showing the potential revenue benefit based on same-property revenue dropping 15-35%, an average of the -43% reported in the 1Q and the -8% reported for the full year.

Using this method, we estimate up to 6% of 2017 revenues could be the result of the loans. And assuming the revenue is all incremental, it would represent 75% to 310% of reported 2017 net income and 74% to 303% of 2017 cash flow from operations.

| | Reported | | Scenario #1 | Scenario #2 | Scenario #3 | Scenario #4 | Scenario #5 |
|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2017E | 2017E | 2017E | 2017E | 2017E |
| Reported Same-Property Revenue | 10.60 | 9.70 | 9.01 | 8.48 | 7.95 | 7.42 | 6.89 |
| Same-Property Revenue Decline | | -8.5% | -15% | -20% | -25% | -30% | -35% |
| Revenue Improvement vs. Reported | | | 0.69 | 1.22 | 1.75 | 2.28 | 2.81 |
| % of 2017 Total Revenue | | | 1.5% | 2.6% | 3.8% | 4.9% | 6.1% |
| % of 2018 Net Income | | | 76.1% | 134.5% | 192.9% | 251.4% | 309.8% |
| % of 2018 Cash Flow From Operations | | | 74.3% | 131.3% | 188.4% | 245.4% | 302.5% |

*Source: Chart By Author, Using SEC Filings*

**And this is just 2017. In the 1Q2018, FPI reported it largest ever same-property gain, which coincides with originating its largest ever loan (the $5.25 Million loan to Siffring Farms).**

Our opinion that FPI appears to be playing accounting games is further bolstered by what we consider to be another major red flag.

## "Pittman Hough" Get A Loan Against FPI Shares

According to a February 13th, 2017, Colorado UCC filing, Hough Holdings put up its equity interest in Farmland Partners for a bank loan. But notice, at the bottom of the document is a line that states **"Optional filer reference: (Bank of the West)/Pittman Hough."** Being that Pittman-Hough Farms disclosed in a 2016 Form 4 that it distributed its shares to its members, we think the UCC filings is referring to Pittman and Hough personally. We note that the UCC filing also uses FPI's corporate address.

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HOUGH HOLDINGS LLC | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4600 S SYRACUSE STREET, SUITE 1450 | DENVER | CO | 80237 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HOUGH HOLDINGS, LLC | | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 4600 S SYRACUSE STREET, SUITE 1450 | DENVER | CO | 80237 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| BANK OF THE WEST | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 13220 CALIFORNIA STREET | OMAHA | NE | 68154 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL OF DEBTOR'S ESTATE, RIGHT, TITLE, AND INTEREST IN THE FOLLOWING:**

**(A) ALL SHARES OR OTHER EQUITY INTERESTS IN FARMLAND PARTNERS, INC. OWNED BY DEBTOR AND HELD IN THAT CERTAIN ACCOUNT WHICH IS SUBJECT TO THE SECURITIES ACCOUNT CONTROL AGREEMENT BY AND AMONG PERSHING LLC, DEBTOR, AND SECURED PARTY; AND**
**(B) ALL PROCEEDS THEREFROM.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility    6b. Check only if applicable and check only one box: ☐ Agricultural Lien  ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
**BOTW/PITTMAN HOUGH** UCC Financing Statement - 20172014011 - Colorado Secretary of State - Page 3 of 3

*Source: Colorado UCC Filings*

The timing of this loan is interesting because just days later, on February 18th, 2017, FPI entered into a termination agreement with Prudential as part of its acquisition of AFCO. And on the 1Q2017 conference call, Pittman stated:

> *We frankly expected substantial stock price appreciation based on the AFCO acquisition and the termination of Prudential and all of that, and frankly none of which we got.*

Instead of going up, FPI's stock price declined 30% over the following months. And shortly after the stock reached a new low, FPI made its first loan to Hough.

Our opinion that Pittman pledged his shares is further bolstered by the fact that on July 19th, 2017, he converted 531,827 operating partnership shares (OP units) to common shares. July 19th (a Sunday) came after FPI's stock closed at the new all-time low that Friday. Seeing that Pittman has not sold any shares, we question why he would be willing to convert OP Units, whose primary purpose is to delay having to pay capital gains taxes. We think the bank may have required the conversion of OP units because it wanted liquid collateral.

And, based on his comments in quarterly conference calls, Paul Pittman seems to have become highly focused on FPI's stock price. On the 1Q2018 conference call, Pittman stated:

> *What I don't control is the stock price. I wish I did, but I don't"*

And the stock price is one of the reasons that FPI is not lowering its dividend despite the fact that it is not covered by cash flow:

> *The next point I want to make, and we've studied this, if you go look at purely what happens when somebody reduces a dividend, it does not lead to a stock price increase, it leads to a stock price decrease… we searched the topic. Dividend decreases do not lead to higher stock prices, they lead to lower stock prices.*

But we do not think FPI's dividend being cut is the largest risk.

# Insolvency Risk

While shareholders have expressed concern about FPI's ability to maintain its dividend, we think this significantly understates the real risk, which is that FPI has relied on a hamster wheel of dilutive debt and equity raises to stay afloat. If investors lose faith, FPI may quickly find that its endless stream of capital has run dry. With only $19 Million in cash, we think FPI will not only be forced to cut its dividend but faces a significant risk of insolvency.

And we do not appear to be the only concerned party.

### *Insider Departures & Auditor Dismissal*

Since the first loan to Jesse Hough in July 2017, four board members and FPI's president have announced resignations. Below we detail each of the departures.

| Date | Name | Position | Reason |
|------|------|----------|--------|
| 8/28/17 | John Conrad | Director; Forsythe Farms nominee | Personal reasons |
| 12/5/17 | Dixon Boardman | Director, former Chairman of AFCO | Pursue other business interests |
| 1/18/18 | Darell Sarff | Director, father of FPI VP | Pursue other business interests |
| 3/19/18 | Thomas Gimbel | Director, former CEO of AFCO | Pursue other business interests |
| 4/10/18 | Robert Cowan | President, former President AFCO | Pursue other business interests |

Three of the directors and the president came from FPI's two largest acquisitions (Forsythe Farms and American Farmland Company). These are individuals with significant experience in farmland investing, who sold their holdings to FPI, gained board membership, and have now resigned.

In the case of Forsythe, the 2018 proxy states (pg. 14) the Forsythe Sellers own 23.59% of the diluted shares and have to right to a nominate a board seat as long as they own 10%. In August, their representative resigned and Forsythe has yet to nominate another, which may indicate the intention to liquidate their stake below 10%.

In the case of AFCO, its former Chairman and hedge fund manager, Dixon Boardman, had already sold the majority of his position by the time he resigned in December 2017.

Then on March 10th, 2018, FPI dismissed PWC as its independent auditor. The same day, the company engaged EKS&H, who investors may recognize from MusclePharm and Heska. Muscle Pharm's founder resigned in 2016 after the SEC charged the company with accounting and disclosure violations. Heska was written up on SA for alleged related-party transactions.

Taken together, we think the resignations overlaid with the facts detailed in this report paint an ominous timeline.

| Date | Event Description |
|------|-------------------|
| 2/12/17 | "Pittman/Hough" pledges stock for loan |
| 2/18/17 | FPI terminates Prudential contract |
| 3/16/17 | FPI "renegotiates" Ryan Niebur loan |
| 3/16/17 | FPI lends Ryan Niebur $61,800 and $61,750 is due for new lease |
| 5/8/17 | Pittman states he thought stock would go up |
| 7/7/17 | FPI stock closes at new all time low |
| 7/9/17 | Pittman converts 531,827 OP Units |
| 7/25/17 | FPI makes $100 Thousand loan to PHS Holdings |
| 8/25/17 | FPI makes $669 Thousand loan to Hough Farms |
| 8/28/17 | John C. Conrad resigns from board |
| 12/5/17 | D. Dixon resigns from board |
| 1/12/18 | FPI acquires property from PHS Holdings that secures FPI loan |
| 1/18/18 | FPI makes $5.25 Million loan to Siffring Farms signed by Jesse Hough |
| 1/18/18 | Darrell D. Sarff resigns from board |
| 2/2/18 | Hough Holdings pays off $669,000 loan |
| 3/10/18 | FPI dismisses PriceWaterHouseCoopers |
| 3/19/18 | Thomas Gimbel resigns from board |
| 4/10/18 | Robert Cowan resigns as President of PFI |

= Related-party transactions
= Executive, board or auditor events

*Source: Chart By Author, Using SEC Filings & Deed Records*

But even if the loans to management, misstated financials, pledged shares, potential insolvency, insider departures and dismissed auditor turn out to be benign risks, we still think FPI's shares are significantly overvalued.

## Evidence That FPI Has Overpaid For Properties

Paul Pittman spends time on each conference call trying to convince shareholders that FPI is worth $11.50 to $12.50 per share based on his calculation of net asset value (NAV). On the most recent call, his calculation was based on what FPI paid for the assets and adjusted for modest increases and decreases in value across different regions of the portfolio.

The problem with Pittman's calculation is that he ignores the old adage that "you make your money when you buy" and so what matters most is not what prices do after you buy but what price you paid.

And we think shareholders should be concerned with Pittman's preferred method of property valuation. From the 1Q2016 conference call:

> I don't put a lot of stock in annual appraisals… not because appraisers are bad, but you have to understand, they are forced to perform a certain process and their charge is to do a process based on that set of rules and regulations. It is not really answering the question what farms are worth, it's actually answering a question of what farms are worth under this very mechanical valuation approach, which has a whole set of errors embedded in it.

He then states:

> Given that everything we [acquired] has been an arm's length market transaction of some sort in the last two years, we think acquisition cost is probably the safest judgement of value."

**We think these comments are absurd. First, we have many reasons to question the claim that all acquisitions were arm's length. Second, Pittman apparently thinks the appraisal process is a poor judgement of value, despite its widely accepted use across the real estate industry and its use by a direct competitor. Third, he thinks what he pays, even if he overpays, is the safest judgement of value.**

This is akin to saying that if someone paid $1 Million for a house in a neighborhood filled with $500,000 houses, that all of the properties would see a commensurate $500,000 increase in value just because one person was willing to overpay. And in fact, we have evidence that suggests FPI has overpaid for properties.

## Telfair County, GA

FPI acquired two Telfair County, GA farms in 2015 and one in 2017. Based on what FPI paid for the properties versus what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the 2016 / 2017 USDA Farm Land Surveys), FPI appears to have acquired these properties for 68% above market value (assuming the previous sale was market value).

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Selph Farm | Talfair, Georgia | 5/4/12 | Ernest Selph | 116 | $1,724 | | | |
| | | 12/17/15 | FPI Properties | | $4,537 | 163% | 0.3% | 162.3% |
| Mobley Farm | Talfair, Georgia | Throughout 2012 | Brad Mobley | 1,069 | $2,154 | | | |
| | | 10/9/15 | FPI Properties | | $3,460 | 61% | 0.3% | 60.2% |
| Dorminey Farm | Talfair, Georgia | Throughout 2012 | Carlton Dorminey | 47 | $2,150 | | | |
| | | 4/25/17 | FPI Properties | | $3,809 | 77% | 8.9% | 62.6% |
| | | | Total Adjusted Overpayment % | | | 68% | | |

*Source: SEC Filings & Telfair County, GA Deed Records (Search: FPI Properties)*

While we cannot be sure what improvements, if any, were made to these properties during the sellers' ownership, we note the following:

- Google Street View shows that as far back as 2008 Selph Farm was irrigated farm land.
- The deed record map shows that between 2010 and 2013, part of the Mobley Farm was converted from timberland to farmland, which may explain part of the property value increase.
- The deed record map shows Dorminey Farm had already been cleared of timber before the seller acquired it.

# Yell County, AR

FPI acquired two Yell County, AR farms in 2014. Based on what FPI paid for the properties versus what the sellers paid for the properties in 2012 (and adjusting for value appreciation/depreciation reported by the 2017 USDA Farm Land Survey), FPI appears to have acquired these properties for 17% above market value (assuming the previous sale was market value).

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Seller Price | Avg. Land Appreciation (USDA) | Adjusted Overpayment |
|---|---|---|---|---|---|---|---|---|
| Ruder Farm | Yell, Arkansas | Throughout 2013 | Ruder Properties | 819 | $2,329 | | | |
| | | 9/24/14 | FPI Coloardo | | $3,301 | 42% | 5.5% | 34.3% |
| Ballymore Farm | Yell, Arkansas | 4/3/13 | Ballymore Properites | 1,281 | $3,120 | | | |
| | | 10/24/14 | FPI Arkansas | | $3,588 | 15% | 5.5% | 9.0% |
| | | | Total Adjusted Overpayment % | | | 17% | | |

*Source: SEC Filings & Yell County, AR Deed Records (Search: FPI Colorado, FPI Arkansas)*

We are unsure if any improvements were made to Ruder Farm or Ballymore Farm during the sellers' ownership.

# McDonough County, IL

On July 15th, 2015, FPI acquired the Tomasek Farm from Paul Pittman (disclosed on pg. 49). According to SEC filings and deed records (search: PH Holdings), FPI acquired Pittman's property for 2.5% above what he paid for it in 2014. However, in December 2015, FPI acquired the Howe Farm, also in McDonough County, for a 15% discount to Pittman's Tomasek Farm.

| FPI Farm | County, State | Date | Buyer | Acres | Price/Acre | FPI Price / Comp | Avg. Land Appreciation (USDA) | Avg. Land Appreciation (USDA) |
|---|---|---|---|---|---|---|---|---|
| Tomasek Farm | McDonough, Illinois | 2/20/14 | Paul Pittman | 58 | $11,700 | | | |
| | | 12/17/15 | PH Holdings | | $11,991 | 2% | -0.02% | 2.5% |
| Howe Farm | McDonough, Illinois | 12/1/15 | PH Holdings | 78 | $10,449 | 15% | -0.02% | |

*Source: SEC Filings & McDonough County, IL Deed Records (Search: PH Holdings)*

# *American Farmland Company*

Perhaps the biggest overpayment (in dollar terms) was FPI's acquisition of American Farmland Company (AFCO). The merger proxy (pg. 57) provides a background of the sale process.

The chart below shows that, of the seven preliminary bids, FPI's offer was 12% above the average. The only bid that was higher (Company E) dropped out during diligence because of pricing. A comparable bid (Company F) also dropped out during due diligence.

The only other party to put in a second bid (Company G) lowered its price after getting **independent appraisals**. In the end, FPI paid 15% above the only other bidder.

| AFCO Proposals | Preliminary Bids | Secondary Bids | Deal Notes |
|---|---|---|---|
| Company A | $6.61 | - | AFCO declined due to price |
| Company C & D | $6.75 | - | AFCO declined due to price |
| Company E | $8.82 | - | Dropped out because of "pricing a corporate level transaction" |
| Company F | $8.20 | - | Dropped out during due diligence |
| Company G | $7.72 | $7.13 | Lowered offer to $7.13 after getting independent appraisals |
| Company H | $8.00 | - | AFCO declined because would not alleviate challenges |
| Company J | $6.00 | - | AFCO declined |
| **Average** | **$7.44** | **$7.13** | |
| **Farmland Partners** | **$8.35** | **$8.23** | |
| **Premium To Avg.** | **12%** | **15%** | |

*Source: AFCO/FPI Merger Proxy*

To be clear, we do not believe that FPI overpaid for every property it purchased. However, we think it is highly likely that, in aggregate, FPI has paid an average of 5-15% above market price for its farms. Additionally, we think FPI has seen another 5% decrease across its portfolio, a reasonable assumption given Illinois land values (25% of FPI acres) have fallen approximately 15% (pg. 9) since 2014 and Nebraska farmland is down 24% over the same time.

*Valuing FPI*

Finally, Pittman's valuation calculation assumes a buyer would purchase the entire company at net asset value. Given that only one other player was willing to acquire AFCO (which was less than half FPI's size), and that potential acquirer's offer was a 29% discount to AFCO's reported NAV (pg. 27), we think this assumption is highly unlikely.

More likely is a liquidation scenario, which would include transaction costs, operating expenses and capital expenditures during the liquidation. Evidence that these costs are very real and very material is the fact that the AFCO merger proxy (pg. 67) stated its

investment bankers calculated the value of the company under a liquidation scenario. Their value was between $7.12 and $7.33 or 20% less than the $8.98 book value per share reported in the final 10-Q.

**Notably, the only other offer for AFCO was at the low end of this range.**

We think the best way to value FPI is to take book value per share, which represents what FPI actually paid for the properties (land has no depreciation) and make the following adjustments based on a liquidation scenario:

1. Add appreciation for the legacy properties (on the 1Q2017 call, Pittman stated the difference between book value and his NAV estimate is largely "30-ish" million dollars for the legacy properties, many of which Pittman acquired in the mid-2000s).
2. Subtract overpayment on the remainder of the portfolio (under four escalating scenarios)
3. Subtract 5% reduction in property values
4. Subtract transaction costs of 5% on the disposition of the portfolio
5. Subtract $30 Million in operating expenses and capital expenditures incurred during liquidation period (approximate 2 years)
6. Discount NAV back 1 year at 7.75% (assumes steady sales over 2 years)

Below is our valuation calculation under four scenarios: a 15%, 10%, 5% and 0% overpayment for the post-IPO acquisitions. Using an average of the four scenarios, and assuming normal circumstances, we think FPI would be worth $4.85 per share (n*ote, diluted share count is based on 1Q2018 Supplemental Package pg. 1 2)*.

**And even if we assume FPI did not overpay for properties, FPI would still only be worth $6.39.**

| NAV Calculation | Scenario #1 (15% Overpay) | Scenario #1 (10% Overpay) | Scenario #2 (5% Overpay) | Scenario #3 (No Overpay) |
|---|---|---|---|---|
| Land Value at Cost | 975,107 | 975,107 | 975,107 | 975,107 |
| - Legacy Propert Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| Post IPO Acquisitions at Cost | 936,692 | 936,692 | 936,692 | 936,692 |
| - Overpayment | -140,504 | -93,669 | -46,835 | 0 |
| Market Value of Post IPO Acquisitions (when purchased) | 796,188 | 843,022 | 889,857 | 936,692 |
| - 5% Reduction in Value | 39,809 | 42,151 | 44,493 | 46,835 |
| **Today's Market Value of Post IPO Acquisitions** | **756,378** | **800,871** | **845,364** | **889,857** |
| + Legacy Properties at Cost | 38,415 | 38,415 | 38,415 | 38,415 |
| + Legacy Property Appreciation | 30,000 | 30,000 | 30,000 | 30,000 |
| **Market Value of FPI Land Portfolio** | **824,794** | **869,287** | **913,780** | **958,272** |
| - 5% Transaction Costs | -41,240 | -43,464 | -45,689 | -47,914 |
| - Operating Expenses Over 2 Years | -30,000 | -30,000 | -30,000 | -30,000 |
| **Net Value of FPI Land Portfolio After Dispotiion** | **753,554** | **795,822** | **838,091** | **880,359** |
| Book Value As of 1Q2018 | 357,350 | 357,350 | 357,350 | 357,350 |
| - Net Value After Dispotion vs. Land Value at Cost | -221,553 | -179,285 | -137,016 | -94,748 |
| **Post Disposition NAV** | **135,797** | **178,065** | **220,334** | **262,602** |
| Post Disposition NAV *(Discounted 1.5 yrs @ 7.5%)* | 126,323 | 165,642 | 204,961 | 244,281 |
| *Post Disposition NAV / Share* | *$3.31* | *$4.34* | *$5.37* | *$6.39* |
| Diluted Share Count | 38,200 | 38,200 | 38,200 | 38,200 |

*Source: Chart By Author, Using Author Estimates*

# Conclusion

We valued FPI under normal circumstances, but we think FPI's financials are anything but normal. As the old saying goes, there is never just one cockroach. We have no faith that FPI's financials are showing investors the true picture. Accordingly, we think FPI's shares are uninvestible.

### *Questions For Management*

### *General Questions*

- Has FPI disclosed to shareholders that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough? If so, where?
- Has FPI used the loan program to artificially increase revenues by lending money to Ryan Niebur, Jesse Hough or other tenants who roundtrip the cash back to FPI as rent and interest?

- Has FPI misstated its financials in relation to any loans the company has made under the FPI Loan Program.
- Has FPI signed leases with above-market rents with Jesse Hough, Ryan Niebur or any of the previously reported related-party tenants?

### Ryan Neibur Loans

- Did FPI disclose to shareholders that Ryan Niebur was the borrower on the $980,000 loan originated by FPI on October 30th, 2015? If so, where?
- Did FPI disclose to shareholders that Ryan Niebur used the $980,000 to pay off an existing mortgage instead of for farming operations? If so, where?
- Did FPI disclose to shareholders that Ryan Niebur defaulted on the $980,000 loan? If so, where?
- On March 16th, 2017, did Ryan Niebur sell the Andersons Farm to FPI for $801,800 and then use those proceeds to pay off $801,800 of the $980,000 loan?
- In the first quarter 2017 10-Q, and in subsequent SEC filings, did FPI misstate its financials by reporting the March 16th, 2017 acquisition of three properties from Ryan Niebur as a new $2.194 Million loan?
- Did FPI disclose to shareholders that Ryan Niebur is in bankruptcy? If so, where?
- On March 16th, 2017, did FPI loan Ryan Niebur an additional $61,800 and add it to the remaining balance of the original $980,000 loan thus making the new balance $240,000?
- On March 16th, 2017, did Ryan Niebur make an annual lease payment for $61,750?
- Were the leases signed by Ryan Niebur on March 15th, 2017, at above-market rents?

### Jesse Hough Loans

- Did FPI disclose to shareholders that it lent Jesse Hough $100,000 through PHS Holdings on July 25th, 2017? If so, where?
- Did FPI disclose to shareholders that it acquired the Linwood Farm from PHS Holdings and that the farm was collateral for the $100,000 loan between FPI and PHS Holdings? If so, where?
- Did Jesse Hough/PHS Holdings use the proceeds from the sale of the Linwood Farm to pay off the $100,000 loan between FPI and PHS Holdings?
- Is, or was Jesse Hough ever the president of Siffring Farms?

- Has Jesse Hough ever had an interest in or management/director role in Siffring Farms?
- Does Jesse Hough have an ownership interest in the properties that secure the $5.25 Million loan to Siffring Farms originated by FPI on January 18th, 2018?
- If Jesse Hough is not the President of Siffring Farms and does not hold an ownership interest in the land securing the loan to Siffring Farms, why did he sign as the president of Siffring Farms on the January 18th, 2018 deed of trust?
- Is Siffring Farms an inactive LLC?
- Did Jesse Hough use proceeds of the Siffring Farm loan to make lease payments on the Linwood Farm or any other lease between Jesse Hough, entities he controls and FPI?
- Did FPI disclose to shareholders that it lent Jesse Hough $669,000 through Hough Farms on August 25th, 2017? If so, where?
- Did Jesse Hough use proceeds from the Siffring Farm loan to pay off the $669,000 loan to Hough Farms that FPI originated on August 25th, 2017?
- Does H-KO Land & Cattle Company lease property from FPI?
- Are any of the leases with Jesse Hough (or any of the entities he controls) at above market rents?

### Justice Farms Loan

- In the first quarter 2018 10-Q, FPI disclosed that a loan was settled by the January 12th, 2018 acquisition of a property in NC. Was this loan between Justice Farms of North Carolina or a party affiliated with the Justice family? If so, was this disclosed to shareholders? If so, where?
- Was the subsequent lease signed with Justice Farms of North Carolina at above-market rents?

### Hough Holdings FPI Share Pledge

- Did Jesse Hough, through Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?
- Did Paul Pittman, through Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?

- Why did Paul Pittman convert 531,827 shares of FPI operating partnership units to common shares on July 19th, 2017? Was it to provide collateral for the Bank of the West loan?

**Disclosure:** I am/we are short FPI.

I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it. I have no business relationship with any company whose stock is mentioned in this article.

**Additional disclosure:** IMPORTANT - Please read this Disclaimer in its entirety before continuing to read our research opinion. Investors are encouraged to conduct their own due diligence into these factors. This article represents the opinion of the author as of the date of this article. This article expresses the author's investment opinions, which are based upon interpretation of certain facts and observations, all of which are based upon publicly available information. The information set forth in this article does not constitute a recommendation to buy or sell any security. This article contains certain "forward-looking statements," which may be identified by the use of such words as "believe," "think," "expect," "anticipate," "should," "planned," "estimated," "potential," "outlook," "forecast," "plan" and other similar terms. All are subject to various factors, any or all of which could cause actual events to differ materially from projected events. This article is based upon information reasonably available to the author and obtained from sources the author believes to be reliable; however, such information and sources cannot be guaranteed as to their accuracy or completeness. The author makes no representation as to the accuracy or completeness of the information set forth in this article and undertakes no duty to update its contents. You should assume that as of the publication date the author (possibly along with or through our members, partners, affiliates, employees, and/or consultants) and clients have a short position in all stocks (and are long/short combinations of puts and call options of the stock) covered herein, including without limitation Farmland Partners, Inc. and therefore stand to realize significant gains in the event that the price of its stock declines. The author may also cover his/her short position at any point in time without providing notice. The author encourages all readers to do their own due diligence.

# EXHIBIT B



MATTHEW M. MITZNER
214.810.1488
matthew@matthewmitzner.law

PO Box 38036
Dallas, Texas 75238
www.matthewmitzner.law

# MITZNER PLLC

July 9, 2018

Farmland Partners Inc.
4600 South Syracuse Street, Suite 1450
Denver, Colorado 80237-2766
luca@farmlandpartners.com
legal@farmlandpartners.com
paul@farmlandpartners.com

Re:     **Questions for Management of Farmland Partners Inc.**

To Whom it May Concern:

We represent a group of investors who have been analyzing publicly available information about your company and, noting a series of concerns, they have prepared and anticipate publishing an article about the Farmland Partners Inc. ("FPI") Loan Program—specifically concerning the loans made to Ryan Niebur and Jesse Hough, the disclosures surrounding those loans, and the details of the loans as the may pertain to FPI's reported financials.

Prior to publishing the prepared article, by this email, we are providing your company the opportunity to respond to the main issues the article addresses, represented by our below-listed questions.

If you would like to respond, we request that you please do so within 24 hours of this email.

Please respond via email so that any responses or answers can be understood as accurately as possible. Please be aware that, in light of the deadline and a variety of prior obligations that have me out of the office during this period, we will neither receive nor be responding to any phone calls concerning this matter.

Sincerely,

Matthew M. Mitzner

*General Questions*

- Has FPI disclosed to shareholders that over 70% of its loans (in dollars) have been made to Ryan Niebur and Jesse Hough?  If so, where?

- Has FPI used the loan program to artificially increase revenues by lending money to Ryan Niebur, Jesse Hough or other tenants who roundtrip the cash back to FPI as rent and interest?

- Has FPI misstated its financials in relation to any loans the company has made under the FPI Loan Program?

- Has FPI signed leases with above-market rents with Jesse Hough, Ryan Niebur or any of the previously reported related-party tenants?

*Ryan Neibur Loans*

- Did FPI disclose to shareholders that Ryan Niebur was the borrower on the $980,000 loan originated by FPI on October 30th, 2015?  If so, where?

- Did FPI disclose to shareholders that Ryan Niebur used the $980,000 to pay off an existing mortgage instead of for farming operations?  If so, where?

- Did FPI disclose to shareholders that Ryan Niebur defaulted on the $980,000 loan?  If so, where?

- On March 16th, 2017 did Ryan Niebur sell the Andersons Farm to FPI for $801,800 and then use those proceeds to pay off $801,800 of the $980,000 loan?

- In the first quarter 2017 10-Q, and in subsequent SEC filings, did FPI misstate its financials by reporting the March 16th, 2017 acquisition of three properties from Ryan Niebur as a new $2.194 Million loan?

- Did FPI disclose to shareholders that Ryan Niebur is in bankruptcy?  If so, where?

- On March 16th, 2017 did FPI loan Ryan Niebur an additional $61,800 and add it to the remaining balance of the original $980,000 loan thus making the new balance $240,000?

- On March 16th, 2017 did Ryan Niebur make an annual lease payment for $61,750?

- Were the leases signed by Ryan Niebur on March 15th, 2017 at above-market rents?

### *Jesse Hough Loans*

- Did FPI disclose to shareholders that it leant Jesse Hough $100,000 thru PHS Holdings on July 25th, 2017?  If so, where?

- Did FPI disclose to shareholders that it acquired the Linwood Farm from PHS Holdings and that the farm was collateral for the $100,000 loan between FPI and PHS Holdings?  If so, where?

- Did Jesse Hough/PHS Holdings use the proceeds from the sale of the Linwood Farm to pay off the $100,000 loan between FPI and PHS Holdings?

- Is, or was Jesse Hough ever the president of Siffring Farms?

- Has Jesse Hough ever had an interest in or management/director role in Siffring Farms?

- Does Jesse Hough have an ownership interest in the properties that secure the $5.25 Million loan to Siffring Farms originated by FPI on January 18th, 2018?

- If Jesse Hough is not the President of Siffring Farms and does not hold an ownership interest in the land securing the loan to Siffring Farms, why did he sign as the president of Siffring Farms on the January 18th, 2018 deed of trust?

- Is Siffring Farms an inactive LLC?

- Did Jesse Hough use proceeds of the Siffring Farm loan to make lease payments on the Linwood Farm or any other lease between Jesse Hough, entities he controls and FPI?

- Did FPI disclose to shareholders that it leant Jesse Hough $669,000 thru Hough Farms on August 25th, 2017?  If so, where?

- Did Jesse Hough use the proceeds from the Siffring Farm loan to pay off the $669,000 loan to Hough Farms that FPI originated on August 25th, 2017?

- Does H-KO Land & Cattle Company lease property from FPI?

- Are any of the leases with Jesse Hough (or any of the entities he controls) at above market rents?

*Justice Farms Loan*

- In the first quarter 2018 10-Q, FPI disclosed that a loan was settled by the January 12th, 2018 acquisition of a property in NC.  Was this loan between Justice Farms of North Carolina or a party affiliated with the Justice family?  If so, was this disclosed to shareholders?  If so, where?

- Was the subsequent lease signed with Justice Farms of North Carolina at an above market rents?

*Hough Holdings FPI Share Pledge*

- Did Jesse Hough, thru Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?

- Did Paul Pittman, thru Hough Holdings, pledge shares of FPI for a bank loan with Bank of the West?

- Why did Paul Pittman convert 531,827 shares of FPI operating partnership units to common shares on July 19th, 2017?  Was it to provide collateral for the Bank of the West loan?

JS 44 (Rev. 10/20) - TXND (10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Farmland Partners Inc.

### DEFENDANTS

See attachment

**(b)** County of Residence of First Listed Plaintiff   Denver
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

E. Leon Carter, Campbell Centre II, 8150 N. Central Expressway, Suite 500, Dallas, TX 75206, (214) 550-8188

Attorneys *(If Known)*

Toby M. Galloway, Winstead PC, 300 Throckmorton, Suite 1700, Fort Worth, Texas 76102, (817) 420-8262

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [x] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | **PERSONAL INJURY** | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 365 Personal Injury - Product Liability | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | **PERSONAL PROPERTY** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 370 Other Fraud | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 371 Truth in Lending | **LABOR** | |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 380 Other Personal Property Damage | [ ] 710 Fair Labor Standards Act | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 385 Property Damage Product Liability | [ ] 720 Labor/Management Relations | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 740 Railway Labor Act | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 751 Family and Medical Leave Act | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | [ ] 790 Other Labor Litigation | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | [ ] 791 Employee Retirement Income Security Act | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | |
| | | [ ] 550 Civil Rights | | |
| | | [ ] 555 Prison Condition | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | |

**SOCIAL SECURITY**
[ ] 861 HIA (1395ff)
[ ] 862 Black Lung (923)
[ ] 863 DIWC/DIWW (405(g))
[ ] 864 SSID Title XVI
[ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
[ ] 870 Taxes (U.S. Plaintiff or Defendant)
[ ] 871 IRS—Third Party 26 USC 7609

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
28 U.S.C. § 1332(a)(1)

Brief description of cause:
Disparagement, intentional interference, deceptive trade practice, conspiracy, defamation, and unjust enrichment

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
Over $75,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE   Judge R. Brooke Jackson

DOCKET NUMBER 1:18-cv-02351-RBJ

DATE
Jun 7, 2021

SIGNATURE OF ATTORNEY OF RECORD
/s/ E. Leon Carter

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**Defendants:**

First Sabrepoint Capital Management, LP, Sabrepoint Capital Partners, LP, Sabrepoint Capital Participation, LP, George Baxter, Donald Marchiony, Keith Dilling, and John/Jane Does 1–10